IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>McCULLOCH CORPORATION, )<br>JENN FENG INDUSTRIAL CO., LTD., )<br>MTD SOUTHWEST INC, )<br>and MTD PRODUCTS INC, )<br><br>Defendants. ) | Civil Action No. 1:08-cv-0699-RCL |

## MOTION TO ENTER CONSENT DECREE

Plaintiff, the United States, hereby moves this Court to approve, sign and enter as a final judgment the Consent Decree which was lodged with this Court on April 24, 2008, and in support thereof states as follows.

1.      Pursuant to 28 C.F.R. § 50.7, the United States lodged a proposed Consent Decree ("Decree") with the Court in the above captioned case on April 24, 2008, as Attachment 2 to the Complaint (DKT #1).

2.      The proposed Decree resolves the United States' claims in the Complaint against McCulloch Corporation ("McCulloch"), Jenn Feng Industrial Co., Ltd. ("Jenn Feng"), MTD Southwest Inc. and MTD Products ("MTD") (together the "Defendants") for injunctive relief and

civil penalties under the Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq.* (the "Act"), arising

from the importation and introduction into commerce in the United States of approximately

200,000 chainsaws.

2.     The Consent Decree requires the Defendants to:  1) export all of the subject

chainsaws that have not been sold to consumers; 2) spend approximately $5 million to

implement three projects to mitigate the adverse impacts of the excess emissions from the

violating engines; 3) conduct emissions tests on a representative group of additional engines

imported and introduced into commerce during the 2005 and 2006 model years and offset any

excess emissions discovered as a result of these tests; 4) implement comprehensive compliance

assurance plans to prevent future violations; and 5) pay a civil penalty of $2 million.

3.     Notice regarding lodging of the Decree was published in the Federal Register on

May 2, 2008, at 73 Fed. Reg. 24313.  The Notice provided that the United States Department of

Justice would receive comments relating to the proposed Decree for a thirty-day period, which

period expired on June 2, 2008.  The Department of Justice did not receive any comments on the

Decree by that date, or thereafter.

4.     The undersigned counsel has contacted counsel for each of the Defendants, and

counsel for all of the Defendants have stated Defendants consent to this motion.

5.     The United States believes that entry of the Decree is fair and in the public

interest.  No comments to the contrary have been received.  Defendants have already consented

to entry of the Decree without further notice, pursuant to Section XV of the Decree.  The United

States therefore requests that the Court approve, sign, and enter the Decree lodged by the United

States on April 24, 2008, as Attachment 2 to the Complaint.  The Court's signature line appears

at p. 29 of the lodged Decree.  For the reasons stated above and in the accompanying

Memorandum of Points and Authorities in Support of Motion to Enter Consent Decree, the

United States respectfully moves for entry of the Decree that was lodged with the Court on that

date.


Respectfully Submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
  Division


*Catherine Banerjee Rojko*

CATHERINE BANERJEE ROJKO
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources
  Division
United States Department of Justice
Post Office Box 7611
Washington, D.C.  20044
202.514.5315
202.514.0097 (fax)
District of Columbia Bar No. 415927

OF COUNSEL:

Jeffrey Kodish
Attorney-Advisor
Office of Enforcement and Compliance Assurance
Mobile Sources Enforcement Branch
Western Field Office (8MSU)
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, CO  80202

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil Action No. 1:08-cv-0699-RCL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| McCULLOCH CORPORATION, | ) | |
| JENN FENG INDUSTRIAL CO., LTD., | ) | |
| MTD SOUTHWEST INC, | ) | |
| and MTD PRODUCTS INC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO ENTER CONSENT DECREE

### INTRODUCTION

The United States has moved for entry of a Consent Decree ("Consent Decree" or

"Decree") lodged with the Court in the above captioned case on April 24, 2008, as Attachment 2

to the Complaint (DKT #1).  The proposed Decree resolves the United States' claims in the

Complaint against McCulloch Corporation ("McCulloch"), Jenn Feng Industrial Co., Ltd. ("Jenn

Feng"), MTD Southwest Inc. and MTD Products ("MTD") (together the "Defendants") for

injunctive relief and civil penalties under the Clean Air Act, as amended, 42 U.S.C. § 7401 *et*

*seq.* (the "Act"), arising from the importation and introduction into commerce in the United

States of approximately 200,000 chainsaws ("subject chainsaws").

For the reasons set forth below, the proposed decree is fair, reasonable and consistent

with the statutory scheme of Title II of the Clean Air Act, 42 U.S.C. §§ 7521 - 7589, and in the

public interest. Accordingly, the United States respectfully requests that this Court approve,

sign, and enter the Decree.

## BACKGROUND

### A.    Nonroad SI Regulations

Title II of the Act addresses emissions from "mobile sources," including those from non-

road engines such as those used in the chainsaws at issue in this case. On July 3, 1995, the U.S.

Environmental Protection Agency ("EPA") promulgated Phase 1 regulations to reduce emissions

from small nonroad spark ignition ("SI") engines. *See* 60 Fed. Reg. 34582 (July 3, 1995). On

April 25, 2000, EPA promulgated more stringent Phase 2 emissions standards for small nonroad

SI handheld engines. *See* 65 Fed. Reg. 24268 (April 25, 2000). These regulations, which are

known as the Nonroad SI Regulations, set emissions standards and implemented requirements to

ensure that nonroad SI engines maintain their level of emission performance as they age.

Section 213(d) of the Act, 42 U.S.C. § 7547(d), provides that the Nonroad SI Regulations

shall be enforced in the same manner as the standards for motor vehicles, with such

modifications as EPA deems appropriate, and authorized EPA to promulgate regulations that

may be necessary to determine compliance with, and enforce, the nonroad standards. Section

203 of the Act, 42 U.S.C. § 7522(a), sets forth a number of prohibited acts relating to the

manufacture and importation of motor vehicles.

1.    **Certificates of Conformity**

A certificate of conformity is, in effect, a license that allows an engine manufacturer to sell the engine to the public. *See United States v. Chrysler Corp.*, 591 F.2d 958, 960 (D.C. Cir. 1979). In order to obtain a certificate of conformity, a manufacturer must test a prototype engine and establish that the prototype and the production engines will meet the applicable emissions standards. 40 C.F.R. § 90.107 sets forth the information that a manufacturer must include in each certification application, and provides that the application must include an identification and description of the engine and its emission control system. 40 C.F.R. § 90.107(d)(9) also provides that the certification application must contain: "A statement that the test engine(s), as described in the manufacturer's application for certification, has been tested in accordance with the applicable test procedures . . . required under subparts D and E of this part, and that on the basis of such tests the engine(s) conforms to the requirements of this part." EPA's certificates of conformity specify that they cover only those engines which conform, in all material respects, to the design specifications in the certification application. 40 C.F.R. § 90.106 requires small nonroad SI engine manufacturers to obtain a certificate of conformity from EPA prior to selling, offering for sale, introducing into commerce, or importing any nonroad SI engines covered by the regulations. Issuance of the certificate of conformity permits the production and introduction into commerce of engines built in accordance with the manufacturer's application after the date of the certificate and before expiration of the covered model year.

40 C.F.R. § 90.1003(a)(1)(i) prohibits a manufacturer from introducing new small nonroad SI engines into commerce unless they are covered by a certificate of conformity. 40 C.F.R. § 90.3 defines an "engine manufacturer" to include: "any person engaged in the

manufacturing or assembling of new nonroad engines or the importing of such engines for resale, or who acts for and is under the control of any such person in connection with the distribution of such engines." 40 C.F.R. § 90.1003(a)(1)(ii) prohibits any person from importing, or causing the importation, into the United States of any small nonroad SI engine manufactured after the applicable effective date of the regulations unless such engine is covered by a certificate of conformity.

### 2.    Label Requirements

40 C.F.R. § 90.114(a) requires the engine manufacturer to affix, at the time of manufacture of a certified engine, a permanent and legible information label identifying each nonroad engine and setting forth specific information regarding compliance with the Nonroad SI Regulations.  40 C.F.R. § 90.114(c)(4) further requires the emission label to specifically identify the type of exhaust emissions control system on the engine, such as a catalytic converter.  40 C.F.R. § 90.1003(a)(4)(ii) prohibits the sale, introduction, or delivery into commerce by an engine manufacturer of a new nonroad engine manufactured after the applicable effective date of the regulations, unless a label or tag is affixed to the engine in accordance with the Nonroad SI Regulations.

### 3.    Production Line Testing Program

40 C.F.R. Part 90, Subpart H, requires manufacturers to conduct a production line testing program.  This program requires manufacturers to perform emission tests on randomly selected products coming off of the assembly line to assure their designs, as certified, continue to have acceptable emissions performance when put into mass production.  40 C.F.R. § 90.1003(a)(2)(iii)

prohibits any person from failing or refusing to perform tests or to have tests performed as required under 40 C.F.R. § 90.703, which sets forth the production line testing program.

### 4.    **Reporting Obligations**

Section 203(a)(2)(A) of the Act, 42 U.S.C. § 7522(a)(2)(A), prohibits any person from failing or refusing to make reports or provide information to EPA as required by Section 208 of the Act, 42 U.S.C. § 7542.  Section 208(a) of the Act, 42 U.S.C. § 7542(a), requires manufacturers to "establish and maintain records, perform tests…make reports, and provide information the Administrator [of EPA] may reasonably require to determine whether the manufacturer…has acted or is acting in compliance with this part and part C of this subchapter and regulations thereunder…."

40 C.F.R. § 90.803(c) requires a manufacturer to file an Emissions Defect Information Report ("EDIR") with the Administrator within fifteen (15) business days after a manufacturer determines that a specific emission-related defect exists in twenty-five (25) or more engines of a given engine family manufactured in the same certificate or model year.  40 C.F.R. § 90.802 defines an "emission related defect" as a "defect in design, materials, or workmanship in a device, system, or assembly" described in the application for the certificate of conformity which affects any parameter specified in Appendix VIII of 40 C.F.R. Part 85.

### 5.    **Running Changes**

40 C.F.R. § 90.122 sets forth the process for a manufacturer to amend its application and certificate of conformity, or obtain a "running change."  The engine manufacturer must notify EPA when material design changes are to be made to a product line covered by a certificate of conformity.  The manufacturer must request that its existing certificate of conformity be amended

and include specific information to enable EPA to evaluate the request. 40 C.F.R. § 90.122(e)(1)

provides an alternative mechanism which allows the manufacturer to "implement the production

change without EPA pre-approval provided the request for change together with all…supporting

documentation is received at EPA within three working days of implementing the change."

**B.     ALLEGATIONS IN THE COMPLAINT**

The Complaint alleges violations of the Act and the Nonroad SI Regulations relating to

the subject chainsaws, approximately 200,000 chainsaws that were manufactured in Taiwan for

the 2005 and 2006 model years, and imported and introduced into commerce in the United

States. The Complaint alleges that one or more of the Defendants violated 40 C.F.R.

§§ 90.1003(a)(1)(i) and 90.1003(a)(1)(ii) by importing and introducing into commerce 2005

model year engines that are uncertified because they do not conform in all material respects to

the design specifications set forth in the certification application. The Complaint also alleges

that one or more of the Defendants violated 40 C.F.R. § 90.1003(a)(2)(iii) by failing to properly

perform emissions tests on the 2005 model year engines as required under 40 C.F.R. § 90.119,

which sets forth the applicable certification testing procedures, and 40 C.F.R. § 90.703, which

sets forth the production line testing program.

The Complaint sets forth the following allegations relating to the 2006 model year

engines:

•      One or more of the Defendants violated 40 C.F.R §§ 90.1003(a)(1)(i) and

       90.1003(a)(1)(ii) by importing and introducing into commerce 2006 model year engines

       that were uncertified in that they did not conform in all material respects to the design

       specifications set forth in the certification application.

-6-

- One or more of the Defendants violated 40 C.F.R. § 90.1003(a)(4)(ii) by introducing nonroad engines into commerce with emission labels that did not properly identify the type of exhaust emissions control system on the engines as required by 40 C.F.R. § 90.114(b)(4). The labels incorrectly stated that the engines had catalytic converters.

- One or more of the Defendants violated 40 C.F.R. § 90.803(c) by failing to file an EDIR with EPA within fifteen (15) business days after determining that there were specific emission-related defects in twenty-five (25) or more engines of a given engine family manufactured in the same certificate or model year. The late EDIR that Defendants filed was faulty in that it was not complete, and identified faulty labeling problems as the defect, instead of the failure to install catalytic converters.

- One or more of the Defendants violated 40 C.F.R. § 90.122 by failing to submit a valid running change prior to making material design changes to the 2006 model year engines, in that they were certified with catalytic converters but produced without them.

## C.    <u>CONSENT DECREE PROVISIONS</u>

The Consent Decree requires the Defendants to: 1) export all of the subject chainsaws that have not been sold to consumers; 2) spend approximately $5 million to implement three projects to mitigate the adverse impacts of the excess emissions from the violating engines; 3) conduct emissions tests on a representative group of additional engines manufactured and imported during the 2005 and 2006 model years and offset any excess emissions discovered as a result of these tests; 4) implement comprehensive compliance assurance plans to prevent future violations; and 5) pay a civil penalty of $2 million.

1.    **Export Plan**

The Consent Decree requires all of the subject chainsaws that have not been sold to consumers to be exported outside of North America.  According to estimates provided by the Defendants (*see* Appendix B and Appendix C of Consent Decree), approximately 80,000 unsold chainsaws remained in the United States as of the approximate date that Defendants signed the Decree.

The Decree requires the Defendants to export these chainsaws in accordance with the procedures set forth below:

- The Defendants must inform each buyer, in writing, that the chainsaws do not meet EPA standards and may not be sold in the United States, Mexico or Canada.

- Defendants must label all shipping containers "for export only."

- Defendants must track each chainsaw that it exports by BJ number (an internal tracking system) and engine family number, and certify to EPA the BJ number and engine family number of each chainsaw exported.  The Defendants must also provide EPA on a quarterly basis with a spreadsheet identifying the BJ number and engine family number of each chainsaw exported.

- Defendants must retain all records relating to the sale and shipment of the exported engines for a period of at least five years from the date it begins exporting any of the subject engines.

*See* Appendix B and Appendix C of Decree.

2.     **Mitigation Projects**

The Consent Decree requires the Defendants to spend approximately $5 million on three

projects to mitigate the adverse impact of emissions from the chainsaws sold to consumers

("Mitigation Projects").  The Mitigation Projects are as follows:

- **LED Streetlights ($2.75 Million):**  The Decree requires Jenn Feng and McCulloch to

    spend at least $2.75 million to provide light-emitting diode ("LED") streetlights, sport

    lights or parking lot lights to selected cities in the United States.  These LED lights will

    be used to replace traditional sodium lights and will reduce emissions of volatile organic

    compounds ("VOCs") and other criteria pollutants, greenhouse gas emissions, and energy

    consumption.  *See* Appendix G, at p. 1.  Cities will be selected based upon criteria set

    forth in Appendix G of the Consent Decree, including cities in those areas most affected

    by ozone and cities in states or regions of the country where substantial numbers of the

    subject chainsaws were sold.  *Id.*

- **Purchase and Surrender of NOx Allowances ($1.25 Million):**  The Consent Decree

    requires Jenn Feng and McCulloch to spend at least $1.25 million to purchase and then

    surrender to EPA Ozone Season NOx Allowances.  The Defendants must spend $1.25

    million to acquire these allowances on the open market and then permanently retire them,

    thereby reducing the total number of NOx (nitrogen oxide) tons that may be emitted.  *Id.*

    at pp. 1-2.

- **1 Million Low-Permeable Fuel Lines (approximately $1 Million):**  The Decree

    requires MTD to install low-permeable fuel lines that will prevent or reduce VOC

    permeation emissions in at least 1 million small, spark-ignited engines used for handheld

lawn and garden applications. Permeation emissions occur due to the permeation of the fuel through the lines, which are ordinarily manufactured from plastic or polycarbonate materials. *See* Appendix G, at p. 2. Once the fuel permeates through the fuel lines, it will rapidly evaporate and contribute to evaporative VOC emissions, which are a precursor for ozone formation. The low-permeable fuel lines required by the Consent Decree will be similar to those used in automotive applications and will reduce VOC emissions from permeation by approximately 90-100%. *Id.* at pp. 2-3. MTD estimates that installation will cost $1 per unit, for a total of approximately $1 million to be spent on this project.

Should Jenn Feng and McCulloch fail to perform their two mitigation projects, the purchase and surrender of NOx allowances and the LED streetlight project, MTD shall spend the difference between what Jenn Feng and McCulloch were required to spend and what they actually spent to purchase additional low-permeable fuel lines.

### 3.    <u>Testing and Offsets Relating to Other Engines</u>

The Decree requires Jenn Feng and McCulloch to conduct emissions tests on a representative sample of other engines (outside of the subject chainsaws) that it produced for sale in the United States during the 2005 and 2006 model years. In addition to testing chainsaw engines, Jenn Feng and McCulloch are testing representative samples of various engines for blowers and trimmers. The Consent Decree requires not only that they conduct these emissions tests, but also that Jenn Feng and McCulloch then increase the amounts spent on the Mitigation Projects identified above by an amount sufficient to offset roughly twice the emissions caused by the sales of any engines that tested over the applicable emissions standard. *See* Appendix F of Consent Decree.

-10-

4.    **Compliance Plans**

The Consent Decree includes rigorous compliance assurance plans that require the Defendants to take significant actions to prevent future violations.  Key elements of these plans include the following:  1) McCulloch and Jenn Feng will conduct all required emissions tests at U.S. labs until they can demonstrate that their overseas labs can produce reliable test results; 2) MTD will implement a pre-import verification process and an import verification process that will involve confirmatory emissions tests; and 3) all Defendants will a) set up a compliance hotline, b) conduct training, and c) report results of the compliance plans to EPA.  The Consent Decree also requires MTD to collect a sample of the handheld nonroad engines imported during the 2005 and 2006 model years, and to examine and test the engines for compliance.  In sum, the compliance assurance plans in the Consent Decree should help ensure future compliance by these Defendants with the Nonroad SI Regulations.  *See* Appendix D and Appendix E of Consent Decree.

Jenn Feng and Husqvarna have recently announced that Jenn Feng intends to sell its Lawn & Garden and Power Equipment Divisions to Husqvarna.  These divisions of Jenn Feng were involved in manufacturing engines that were subject to the Nonroad SI Regulations when imported into the United States, and the engines that are the subject of Appendix D's compliance assurance plan.[1/]  In the event the sale is finalized, whether Husqvarna would be subject to the terms of the Decree would be governed by Section III, Paragraph 4 of the Decree, which provides

---

[1/] *See* "Press Release," Jenn Feng Industrial Co., Ltd. (March 17, 2008), previously available at www.jengfeng.com and attached hereto as Exhibit 1, and "Husqvarna signs agreement for acquisition of Jenn Feng outdoor products operation" (March 17, 2008), Husqvarna's press release, available at www.husqvarna.com, and attached hereto as Exhibit 2.

that the obligations of the Consent Decree are binding upon the Defendants and their "successors, and assigns . . ."

The Decree also provides for stipulated penalties for violations of the Decree's requirements, including failures to 1) pay the civil penalty, 2) adopt and implement the compliance plans; 3) undertake and complete the Mitigation Projects; 4) timely export remaining chainsaws as per the export plan; and 5) to implement the required engine testing. *See* Section VII of Consent Decree.

D.    **NOTICE OF THE PROPOSED SETTLEMENT AND COMMENTS RECEIVED**

As noted above, pursuant to 28 C.F.R. § 50.7, notice of the Decree was published in the Federal Register on May 2, 2008, at 73 Fed. Reg. 24313. The United States received no comments in response to the Federal Register notice.

## ARGUMENT

**THE COURT SHOULD ENTER THE PROPOSED DECREE AS IT IS A FAIR AND REASONABLE SETTLEMENT CONSISTENT WITH THE PUBLIC INTEREST**

The standard to be applied by a court reviewing a proposed consent decree is whether the settlement is "fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." *Envtl. Defense v. Leavitt*, 329 F. Supp. 2d 55, 70 (D.D.C. 2004) (quoting *Citizens for a Better Env't. v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983); and *United States v. Dist. of Columbia*, 933 F. Supp. 42, 46-47 (D.D.C. 1996)). In general, a reviewing court should be satisfied that a proposed settlement fairly and reasonably resolves a controversy in a manner consistent with the public interest. *Envtl. Defense*, 329 F. Supp. 2d at 70 (citation omitted). By these criteria, the Decree should be approved.

Furthermore, this Court has recognized that the policy of favoring settlements "has particular force where . . . a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *Id.* (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)).

## A.    The Consent Decree Is Procedurally and Substantively Fair

Whether a proposed decree is "fair" invokes notions of procedural fairness and substantive fairness. Factors to be considered in reviewing procedural fairness include the "good faith" efforts of the parties to resolve a dispute, "the opinions of the counsel, and the possible risks involved in litigation if the settlement is not approved." *Envtl. Defense,* 329 F. Supp. 2d at 70 (quoting *United States v. Dist. of Columbia*, 933 F. Supp. at 48). *See also, e.g., United States v. Hooker Chem. & Plastics Corp.*, 607 F. Supp. 1052, 1057 (W.D.N.Y.), *aff'd*, 776 F.2d 410 (2d Cir. 1985). Substantive fairness involves "concepts of corrective justice and accountability." *Envtl. Defense,* 329 F. Supp. 2d at 70 (citation omitted).

The Consent Decree is the product of extensive negotiation between EPA, represented by EPA counsel and the Department of Justice, and Defendants, represented by outside counsel. The settlement holds the Defendants accountable for their failures to comply with the Act and the Nonroad SI Regulations by imposing $2 million in civil penalties and by requiring the performance of approximately $5 million in Mitigation Projects to reduce emissions of NOx and VOCs. The settlement also requires Defendants to conduct emissions tests on a representative group of additional engines manufactured and imported during the 2005 and 2006 model years and offset any excess emissions discovered as a result of these tests; and implement comprehensive compliance assurance plans that will require more testing and reporting than

-13-

required by the existing Nonroad SI Regulations. For these reasons, the Consent Decree is both procedurally and substantively fair.

**B.    The Consent Decree Is Reasonable**

The factors for determining the "adequacy, reasonableness and appropriateness" of a proposed consent decree "focus on the extent to which the decree is confined to the dispute between the parties and whether the decree adequately accomplishes its purported goal." *Envtl. Defense,* 329 F. Supp. 2d at 71. The reviewing court should determine whether the proposed decree is "reasonable from an objective point of view" and not "impose its own judgments as to how it would prosecute and resolve a particular case." *Id.*, citing *United States v. Dist. of Columbia*, 933 F. Supp. at 50.

The proposed decree is objectively reasonable, addressing the conduct and consequences of Defendants' noncompliance with the Nonroad Regulations, including failure to file timely and accurate EDIRs with EPA, importing and introducing into commerce engines that did not conform with the applicable certificates of conformity, and failures to conduct proper testing of engines. The Decree requires Jenn Feng and McCulloch to test a representative sample of engines outside of the subject chainsaws to determine compliance with the emissions standards, and requires all Defendants to implement rigorous compliance plans to ensure future compliance. The proposed decree is thus objectively adequate, reasonable, and appropriate.

**C.    The Proposed Decree Is In The Public Interest**

Congress passed the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1). In 1990, Congress amended

the Act, including the mobile source control provisions of Title II, in recognition of the fact that "[c]ontrols on emissions from mobile sources will be an important part of the efforts to attain healthy air . . . for a simple reason: mobile vehicles are the largest source of ozone and carbon monoxide pollution." S. Rep. No. 101-228 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3468. The proposed decree furthers these Congressional goals and thus serves the public interest.

The proposed decree requires Defendants to export non-compliant engines that have not been sold to consumers and implement compliance programs to prevent future violations. Further, the Decree requires Defendants to implement three Mitigation Projects to offset the adverse emissions impacts of their alleged violations. Thus, the Decree is consistent with and enforces existing law and imposes specific measures designed to ensure that Defendants' nonroad engines and internal regulatory compliance programs conform to the requirements of the Act. As such, the Decree is in the public interest.

## CONCLUSION

For the reasons set forth above, the Court should approve and sign the Consent Decree (on p. 29) and enter it as a final judgment.

Respectfully Submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
 Division

CATHERINE BANERJEE ROJKO
Senior Attorney

-15-

Environmental Enforcement Section
Environment and Natural Resources
  Division
United States Department of Justice
Post Office Box 7611
Washington, D.C.  20044
202.514.5315
202.514.0097 (fax)
District of Columbia Bar No. 415927

OF COUNSEL:

Jeffrey Kodish
Attorney-Advisor
Office of Enforcement and Compliance Assurance
Mobile Sources Enforcement Branch
Western Field Office (8MSU)
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, CO  80202

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of June 2008, true and correct copies of the Motion to

Enter Consent Decree and Memorandum in Support of Motion to Enter Consent Decree in

*United States v. McCulloch Corporation, et al.*, were served on the following counsel by first

class mail properly addressed:

Counsel for MTD Products Inc and MTD Southwest Inc:

RICHARD T. COYNE, ESQ.
HEATHER ROSS, ESQ.
Wegman, Hessler & Vanderburg
6055 Rockside Woods Blvd., #200
Cleveland, Ohio  44131

Counsel for McCulloch Corporation and Jenn Feng Industrial Co., Ltd:

FRANCIS X. LYONS, ESQ.
THOR W. KETZBACK, ESQ.
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3300
Chicago, Illinois  60602

CATHERINE BANERJEE ROJKO
Senior Attorney