IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUN 2 6 2008

Clerk, U.S. District and
Bankruptcy Courts

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| McCULLOCH CORPORATION, | ) |
| JENN FENG INDUSTRIAL CO. LTD., | ) |
| MTD SOUTHWEST INC, | ) |
| and MTD PRODUCTS INC, | ) |
| Defendants. | ) |

Civil Action No.  $08-699$

**CONSENT DECREE**

TABLE OF CONTENTS

I.      JURISDICTION AND VENUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    APPLICABILITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     INJUNCTIVE RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.      REPORTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VI.     CIVIL PENALTY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VII.    STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VIII.   FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IX.     DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

X.      RIGHT OF ENTRY/RECORDS RETENTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

XI.     EFFECT OF DECREE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

XII.    NON-WAIVER PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

XIII.   COSTS OF SUIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XIV.    MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XV.     PUBLIC COMMENT AND ENTRY OF CONSENT DECREE  . . . . . . . . . . . . . . . . . . 26

XVI.    TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XVII.   SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

XVIII.  INTEGRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

XIX.    FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

XX.     RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

XXI.    APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

WHEREAS, Plaintiff, the United States of America, at the request of the Administrator of the United States Environmental Protection Agency ("EPA") and by authority of the Attorney General, filed a Complaint herein against Defendants McCulloch Corporation ("McCulloch"), Jenn Feng Industrial Corporation, Ltd. ("Jenn Feng"), MTD Southwest Inc and MTD Products Inc (together "MTD") alleging violations of the Clean Air Act (the "Act"), as amended, 42 U.S.C. § 7401 *et seq.*, and the regulations promulgated thereunder at 40 C.F.R. Part 90 ("Small Nonroad SI Regulations") arising from the manufacture and importation of a number of chainsaws powered by nonroad engines that were not covered by a Certificate of Conformity; and

WHEREAS, MTD approached EPA and informed it of the alleged violations at issue in this case, and the Defendants have cooperated with EPA and acted in good faith throughout this investigation and through the negotiations and development of mitigation projects;

WHEREAS, McCulloch has conducted confirmatory certification testing on certain 2007 Model Year engines; and

WHEREAS, by agreeing to entry of this Consent Decree, McCulloch, Jenn Feng and MTD (collectively, the "Defendants") make no admission of law or fact with respect to any of the allegations set forth in the Consent Decree or the Complaint filed herewith and deny any violation of any law or regulation identified herein;

WHEREAS, the United States and the Defendants have consented to entry of this Consent Decree without trial of any issues; and

WHEREAS, the United States and Defendants recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the United States and the Defendants in good faith, that implementation of this Consent Decree will avoid prolonged and

complicated litigation between the United States and the Defendants, and that this Consent

Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or

admission of any issue of fact or law, and with the consent of the Parties, it is hereby

ADJUDGED, ORDERED, AND DECREED as follows:


## I. JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and the Parties

pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and Sections 203, 204, 205 and 213 of the Act, 42

U.S.C. §§ 7522, 7523, 7524 and 7547.  Venue in this District is proper pursuant to Sections 204

and 205 of the Act, 42, U.S.C. § 7523 and 7524.

2.      For purposes of this Consent Decree, the Defendants agree that the Complaint

states claims upon which relief may be granted pursuant to Sections 203, 204, 205 and 213 of the

Act, 42 U.S.C. §§ 7522, 7523, 7524, and 7547.

## II. DEFINITIONS

3.      Unless specifically defined in this Section or elsewhere in this Consent Decree,

terms used in this Consent Decree shall have the meanings currently set forth in Sections 202,

216 and 302 of the Act, 42 U.S.C. §§ 7521, 7550, and 7602, and the regulations promulgated

under Title II of the Act, 42 U.S.C. §§ 7521–7590.

a.  "Act" means the Clean Air Act, as amended, 42 U.S.C. §§ 7401 *et seq.*

b.  "Certificate of Conformity" means a certificate issued by EPA pursuant to Section 206

of the Act, 42 U.S.C. § 7525 and 40 C.F.R. § 90.108.

c. "Consent Decree" or "Decree" means this document, including the Appendices.

d. "Complaint" means the complaint filed by the United States in this action.

e. "Day" means a calendar day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

f. "Defendants" shall mean McCulloch, Jenn Feng, and MTD.

g. "Effective Date" is the date the Consent Decree is approved by the Court.

h. "Engine Family" means a group of engines, as specified in 40 C.F.R. § 90.116.

i. "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

j. "Interest" means interest at the rate allowed on money judgments pursuant to 28 U.S.C. § 1961.  For the purposes of calculating interest under Paragraph 24 of this Consent Decree, interest shall begin to accrue on the date that is thirty (30) days after the Effective Date and such date shall be viewed as the "date of the entry of judgment" under 28 U.S.C. § 1961(a).  For the purposes of calculating interest owed under Paragraphs 29 and 34 of this Consent Decree, interest shall begin to accrue on the date that is thirty (30) days from the day that EPA sends a demand for payment of stipulated penalties under Paragraph 32 of the Consent Decree and such date shall be viewed as the "date of entry of judgment" under 28 U.S.C. § 1961(a).

k. "Model Year" means model year as defined in 40 C.F.R. § 90.3.

l. "Paragraph" means a portion of this Consent Decree identified by an Arabic numeral.

m. "Parties" means the United States, McCulloch, Jenn Feng and MTD, and each shall be a "Party."  "MTD" shall mean MTD Southwest Inc and MTD Products Inc.

n. "Project Dollars" shall mean the Defendants' expenditures and payments incurred or made in carrying out the projects identified in Paragraph 14 of this Consent Decree (Mitigation Projects) to the extent that such expenditures or payments both: (a) comply with the Project Dollar and other requirements set by Paragraph 14 of this Consent Decree (Mitigation Projects) for such expenditures and payments; and (b) constitute the Defendants' documented external costs for contractors, vendors, as well as equipment, and its internal costs consisting of employee time, travel, and other out-of-pocket expenses specifically attributable to these particular projects. Notwithstanding the above, for MTD only, "Project Dollars" shall mean the number of units produced with low-permeable fuel lines pursuant to the Mitigation Project required by Paragraph 14 and Appendix G.

o. "Section" means a portion of this Consent Decree identified by a Roman numeral.

p. "Subject Chainsaws" means the 2005 and 2006 Model year 50cc and 55 cc chainsaws manufactured by McCulloch or Jenn Feng, and identified at Appendix A.

q. "United States" means the United States of America, acting on behalf of EPA.

### III.  APPLICABILITY

4.      The obligations of this Consent Decree apply to and are binding upon the United States and upon the Defendants, their successors, and assigns, and upon their employees, contractors, and agents solely in their capacities as such. Unless approved by EPA in writing, any change in the Defendants' ownership or corporate status shall in no way alter their responsibilities under this Consent Decree.

5.      Except as set forth in Paragraphs 8 through 12 of this Consent Decree, the obligations of the Defendants under this Consent Decree to make payments and to implement injunctive relief are joint and several obligations of McCulloch, Jenn Feng and MTD.

6.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendants shall include a condition with any such contract that performance of the work must be conducted in conformity with the terms of this Consent Decree.

7.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.  INJUNCTIVE RELIEF

8.      Export of Subject Chainsaws.  MTD shall export the Subject Chainsaws identified in Appendix B in accordance with the MTD Export Plan set forth in Appendix B.  MTD shall deliver these Subject Chainsaws to a freight forwarder for export within one-hundred eighty (180) days of the Effective Date of this Consent Decree, and cause the Subject Chainsaws to be exported to a country outside of North America within one-hundred eighty (180) days of the Effective Date of this Consent Decree.

9.      McCulloch and Jenn Feng shall export the Subject Chainsaws identified in Appendix C to a country outside of North America in accordance with the McCulloch/Jenn Feng Export Plan set forth in Appendix C within one-hundred eighty (180) days of the Effective Date of this Consent Decree.

-5-

10.    <u>Nonroad Compliance Plans</u>.  Within ninety (90) days of the Effective Date of this

Consent Decree, McCulloch and Jenn Feng shall adopt and implement a Nonroad Compliance

Plan applicable to McCulloch and Jenn Feng in accordance with Appendix D.

11.    Within ninety (90) days of the Effective date of this Consent Decree, MTD shall

adopt and implement a Nonroad Compliance Plan applicable to MTD in accordance with

Appendix E.

12.    <u>Emissions Testing</u>.  Within thirty (30) days after Effective Date of this Consent

Decree, Jenn Feng and McCulloch shall complete emissions tests in accordance with the Test

Plan set forth in Appendix F for three appropriately representative sample engines from each

engine family or group of engine families identified below, and report the results of these

emissions tests to the United States pursuant to Section V (Reporting).  Upon written approval by

EPA, Jenn Feng and McCulloch may use laboratories not otherwise listed in Appendix F to

conduct the emissions tests.

| |
|---|
| 5MHXS.0254AA and 6MHXS.0254AA |
| 5MHXS.0294AB |
| 5MHXS.0424AA and 6MHXS.0424AA |
| 5MHXS.0555AA |
| 6MHXS.0304AA |
| 6MHXS.0354AA |
| 6MHXS.0404AA |
| 6MHXS.0555AA |

13.    If the average test results determined in accordance with Appendix F from any

engine family or group of engine families identified above exceeds the applicable emissions

-6-

standards, the Defendants shall mitigate the excess emissions caused by these engines by calculating Additional Project Dollars in accordance with the formula set forth in Appendix G and by spending the Additional Project Dollars on Mitigation Projects described in Appendix G.

14.    <u>Mitigation Projects</u>.  The Defendants shall implement the Mitigation Projects ("Projects") described in Appendix G in compliance with the applicable schedules set forth in this Appendix.  The Defendants shall maintain, and present to the United States upon request, all documents to substantiate the environmental benefits of the Projects and the Project Dollars expended, and shall provide these documents to the United States within thirty (30) days of a request by the United States for such documents.  The Defendants shall use good faith efforts to secure as much environmental benefit as possible from the Projects, consistent with the applicable requirements and limits of this Consent Decree.  If one Defendant is in default of its obligations set forth in Appendix G, that Defendant shall notify the other Parties.  Any public statement, oral or written, in print, film, or other media, made by any Defendant making reference to the Mitigation Projects under this Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, *United States v. McCulloch, et al.*, taken on behalf of the U.S. Environmental Protection Agency under the Clean Air Act."

15.    Within sixty (60) days following the completion of each Mitigation Project required under this Consent Decree, the Defendants shall submit to the United States a report pursuant to Section V (Reporting) that documents the date that the Mitigation Project was completed, the results of implementing the Mitigation Project, including the emission reductions or other environmental benefits achieved, and the costs incurred by the Defendants in

-7-

implementing the Mitigation Project. With regard to the Mitigation Projects, Defendants shall certify the truth and accuracy of each of the following:

   a. that all cost information provided to EPA in connection with EPA's approval of the Mitigation Projects is complete and accurate;

   b. that, as of the date of executing this Decree, Defendants are not required to perform or develop any of the Mitigation Projects by any federal, state, or local law or regulation and are not required to perform or develop the Mitigation Projects by agreement, grant, or as injunctive relief awarded in any other action in any forum;

   c. that the Mitigation Projects are not projects that Defendants were planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

   d. that Defendants have not received and will not receive credit for the Mitigation Projects in any other enforcement action; and

   e. that Defendants will not receive any reimbursement for any portion of the Mitigation Projects from any person, other than another Defendant.

  16. All plans and reports prepared by the Defendants pursuant to the requirements of this section of the Consent Decree shall be publicly available without charge. However, Defendants may assert that any part of these plans or reports are protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendants seek to protect as CBI, Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

  17. Beginning six months after the Effective Date of this Consent Decree, and continuing until all Projects are completed in accordance with this Decree, each Defendant shall provide the United States and the other Defendants with semi-annual updates concerning the

progress of, the environmental benefits and the costs incurred in implementing the Mitigation

Projects identified in Appendix G.

## V. **REPORTING**

18.    Each notice, submission, or report required by this Consent Decree shall be

accompanied by a transmittal letter referencing the appropriate Paragraph of this Consent Decree.

The Defendants, through duly authorized representatives having knowledge of the contents of the

notice, submission, or report, shall sign and certify under 28 U.S.C. § 1746 as follows:

> I certify under penalty of law that I have examined and am familiar
> with the information submitted in this document and all attachments
> and that this document and its attachments were prepared either by
> me personally or under my direction or supervision in a manner
> designed to ensure that qualified and knowledgeable personnel
> properly gathered and presented the information contained therein.
> I further certify, based on my personal knowledge or on my inquiry
> of those individuals immediately responsible for obtaining the
> information, that the information is true, accurate, and complete. I
> am aware that there are significant penalties for submitting false
> information, including the possibility of fines and imprisonment for
> knowing and willful submission of a materially false statement.

The Defendants shall not object to the admissibility in evidence of any such reports in a

proceeding to enforce this Consent Decree.

19.    Compliance with the reporting and notification requirements of this Consent

Decree shall not relieve the Defendants of their obligations to comply with any other reporting or

notification requirements imposed by any current or future federal, state, or local laws,

regulations, or permits.  Nothing contained in this Consent Decree is intended to waive or modify

any requirement to submit reports or notifications to the United States or EPA as required by any

statute, regulation, or other law or provision.

20.    Unless otherwise provided herein, reports, submissions, notifications to, or communications with the United States or the Defendants shall be deemed submitted on the date they are postmarked and sent by first class mail, overnight receipt mail service, or by certified or registered mail, return receipt requested.  Except as otherwise specifically provided herein, when written notification to or communication with the United States, EPA or the Defendants is required by the terms of this Consent Decree, it shall be addressed as follows:

As to the United States and EPA:

Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington D.C. 20044-7611
Re: DOJ No. 90-5-2-1-09103

Director
Air Enforcement Division (2242A)
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Ariel Rios Building South
Washington, D.C. 20004

Jeffrey A. Kodish, Esq.
Office of Enforcement and Compliance Assurance
Mobile Sources Enforcement Branch
Western Field Office (8MSU)
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, CO  80202

Director
Compliance and Innovative Strategies Division (6403J)
Office of Transportation and Air Quality
Office of Air and Radiation

-10-

U.S. Environmental Protection Agency
1310 L Street, N.W.
Washington, D.C. 20004

Manager
Heavy Duty and Nonroad Engine Group (6405J)
Compliance and Innovative Strategies Division
Office of Transportation and Air Quality
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Mailcode 6405J
Washington, DC 20460

As to The Defendants:

Francis X. Lyons , Esq.
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3300
Chicago, Illinois  60602

David Jong
Jenn Feng Industrial Co., Ltd.
No. 19 Lane 118, Sec. 2 Min Tau Rd.
Ping Chang City, Taoyuan, Taiwan, R.O.C.

Judy Quan, Esq.
McCulloch Corporation
5000 Birch Street, Suite 4400
Newport Beach, CA  92660

Richard T. Coyne, Esq.
Wegman, Hessler & Vanderburg
6055 Rockside Woods Blvd., #200
Cleveland, Ohio  44131

Robert T. Moll
MTD Products Inc
P.O. Box 368022
Cleveland, OH 44136-9722

Phillip G. Clouse
MTD Southwest Inc
9235 S. McKemy
Tempe, AZ  85284

-11-

All Parties to the Consent Decree may change the address for providing notices to them by serving all other addressees identified above with a written notice setting forth the new address.

## VI. CIVIL PENALTY

21.     Defendants shall pay a civil penalty to the United States, in two equal installments, in the total amount of $2,000,000, together with Interest on any amounts not paid within thirty (30) days of the Effective Date.  The first payment, in the amount of $1,000,000, shall be due no later than thirty (30) days after the Effective Date.  The second payment, also in the amount of $1,000,000, shall be due no later than ninety (90) days after the Effective Date. Defendants shall pay interest accrued from thirty (30) days after the Effective Date through the date of payment, at the rate established in accordance with 28 U.S.C. § 1961, on any portion of the civil penalty remitted more than thirty (30) days after the Effective Date.

22.     Payment shall be made by Electronic Funds Transfer ("EFT") to the U.S. Department of Justice ("DOJ") in accordance with instructions to be provided to the Defendants following lodging of the Consent Decree by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Columbia.  Any EFT received at the DOJ lockbox bank after 11:00 a.m. Eastern Time will be credited on the next business day.  Notice of the EFT shall simultaneously be mailed to the following:

> Docket Clerk
> Mailcode MS 2214A
> U.S. Environmental Protection Agency
> 1200 Pennsylvania Avenue, N.W.
> Washington, D.C. 20460

Jeffrey A. Kodish, Esq.
Office of Enforcement and Compliance Assurance
Mobile Sources Enforcement Branch
Western Field Office (8MSU)
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, CO  80202

Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Reference DOJ Case No. 90-5-2-1-09103

Richard T. Coyne, Esq.
Wegman, Hessler & Vanderburg
6055 Rockside Woods Blvd., #200
Cleveland, Ohio  44131

Francis  X. Lyons , Esq.
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3300
Chicago, Illinois  60602

23.     At the time of payment, Defendant shall send a copy of the EFT authorization

form and the EFT transaction record, together with a transmittal letter, which shall state that the

payment is for the civil penalty owed pursuant to the Consent Decree in *United States v.*

*McCulloch Corporation, et al.*, and shall reference the civil action number and DOJ case number

90-5-2-1-09103, to the United States in accordance with this Paragraph; by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio  45268

-13-

24.     If the Defendants fail to make the payment required within the time allotted by Paragraph 21, the payment is late.  Late payment is subject to Interest and Stipulated Penalties as provided below.

25.     The Defendants shall not deduct the payment required by Paragraph 21 in calculating its federal income tax.

26.     The United States shall be deemed a judgment creditor for purposes of collection of the payment required by Paragraph 21.

## VII.  **STIPULATED PENALTIES**

27.     The Defendants shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure).  A violation includes failing to  perform any obligation required by the terms of this Decree according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

28.     The following stipulated penalties shall accrue per violation per day for each violation of a requirement identified as follows:

a.  For failure to make the payment required by Paragraph 21 of this Consent Decree when due:  $1,000 per day for each day that the payment is late during the first fifteen (15) days, and $3,500 per day thereafter.

b.  For failure to create, maintain, or provide copies of records or reports as required by this Consent Decree:  $750 per day for the first thirty (30) days of delay; $1,000 per day for the next thirty days of delay; and $1,500 per day for any delay beyond sixty (60) days.

-14-

c.  For failure to timely export the Subject Chainsaws in accordance with Paragraphs 8 or 9 of this Consent Decree:  $200 per engine.

d.  For failure by the applicable Defendant(s) to timely adopt or implement new and/or revised Nonroad Compliance Plans in accordance with Paragraphs 10 or 11 of this Consent Decree:

| For each violation | Penalty |
| --- | --- |
| 1st to 10th day | $750 per day |
| 11th to 30th day | $1,250 per day |
| After 30th day | $2,000 per day |

e.  For failure to undertake and complete any of the Mitigation Projects in compliance with Paragraph 14 and Appendix G of this Consent Decree:  $1,250 per day per Mitigation Project during the first thirty (30) days, $2,750 per day thereafter.

f.  For failure by Jenn Feng and McCulloch to undertake and complete any of the Emissions Testing in compliance with Paragraphs 12 and 13 of this Consent Decree:  $1,000 per day during the first thirty (30) days, $2,500 per day thereafter.  The stipulated penalties set forth in this Paragraph 28(f) shall not apply to MTD.

g.  For any other violation of this Consent Decree: $1,000 per day.

29.    Stipulated penalties shall continue to accrue as provided in Paragraph 28 of this Consent Decree during any Dispute Resolution, but need not be paid until the following:

a.  If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, the Defendants shall pay accrued penalties determined to be owing, together with Interest, to the United States within thirty (30) days of the effective date of the agreement or the receipt of EPA's decision or order.

-15-

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, the Defendants shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) days of receiving the Court's decision.

30.     Subject to the provisions of Section XI (Effect of Decree) of this Consent Decree, the Stipulated Penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for the Defendants' violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of the Act, the Defendants shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

31.     If a date by which the Defendants must meet any obligation of this Consent Decree falls on a holiday or weekend, the due date shall be the following working day. Stipulated penalties shall automatically begin to accrue on the first day the Defendants fails to satisfy any obligation or requirement of this Consent Decree and shall continue to accrue until the violation or deficiency is corrected.  Stipulated penalties shall continue to accrue throughout any dispute resolution process.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

32.     Stipulated penalties shall be paid no later than thirty (30) days following the date that EPA sends to the Defendants a demand for payment of the stipulated penalties which have accrued to date together with an explanation of the basis for the demand.  The Defendants shall pay stipulated penalties owing to the United States by EFT in accordance with Paragraph 22 of this Consent Decree or by certified or cashier's check in the amount due, payable to the "U.S. Department of Justice," referencing DOJ No. 90-5-2-1-09103 and the civil action number of this

-16-

case, and delivered to the office of the United States Attorney, District of Columbia, United

States Attorney's Office, 555 4th Street, NW, Washington, D.C. 20530.

33.     The Defendants shall not deduct stipulated penalties paid under this Section in

calculating its federal income tax.

34.     If the Defendants fail to pay stipulated penalties according to the terms of this

Consent Decree, the Defendants shall be liable for Interest on such penalties.

35.     Notwithstanding any other provision of this Consent Decree, the United States

may, in its unreviewable discretion, waive any portion of a stipulated penalty that has accrued

pursuant to this Consent Decree.

### VIII.  FORCE MAJEURE

36.     A "force majeure event" is any event beyond the control of the Defendants, their

contractors, or any entity controlled by the Defendants that delays the performance of any

obligation under this Consent Decree despite the Defendants' best efforts to fulfill the obligation.

"Best efforts" includes anticipating any potential force majeure event and addressing the effects

of any such event (a) as it is occurring and (b) after it has occurred, preventing or minimizing any

resulting delay to the greatest extent possible.  "Force Majeure" does not include the Defendants'

financial inability to perform any obligation under this Consent Decree.

37.     The Defendants shall provide written notice, as provided in Paragraph 20 of this

Consent Decree, within fourteen (14) days of the time the Defendants first knew of, or by the

exercise of due diligence, should have known of, the event.  The notice shall state:  the

anticipated duration of any delay; its cause(s); the Defendants' past and proposed actions to

prevent or minimize any delay; a schedule for carrying out those actions; and the Defendants'

rationale for attributing any delay to a force majeure event. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to provide written notice as required by this Paragraph shall preclude the Defendants from asserting any claim of force majeure. The Defendants shall adopt all reasonable measures to avoid or minimize such delay.

38.     If the United States agrees that a force majeure event has occurred, the United States may agree to extend the time for the Defendants to perform the affected requirements for the time necessary to complete those obligations. An extension of time to perform the obligations affected by a force majeure event shall not, by itself, extend the time to perform any other obligation. Where the United States agrees to an extension of time, the appropriate modification shall be made pursuant to Section XIV (Modification) of this Consent Decree.

39.     If the United States does not agree that a force majeure event has occurred, or does not agree to the extension of time sought by the Defendants, the United States' position shall be binding, unless the Defendants invoke Dispute Resolution under Section IX (Dispute Resolution) of this Consent Decree. In any such dispute, the Defendants bear the burden of proving, by a preponderance of the evidence, that each claimed force majeure event is a force majeure event, that the Defendants gave the notice required by Paragraph 37, that the force majeure event caused, or will cause, any delay the Defendants claim was, or is, attributable to that event, and that the Defendants exercised, or will exercise, best efforts to prevent or minimize any delay caused by the event.

40.     An extension of one compliance date based on a particular event shall not automatically extend any other compliance date. The Defendants shall make an individual

-18-

showing of proof regarding the cause of each delayed incremental step or other requirement for
which an extension is sought.

## IX. DISPUTE RESOLUTION

41.     Unless otherwise expressly provided for in this Consent Decree, the dispute
resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising
under or with respect to this Consent Decree.  The Defendants' failure to seek resolution of a
dispute under this Section shall preclude the Defendants from raising any such issue as a defense
to an action by the United States to enforce any obligation of the Defendants arising under this
Decree.

42.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under
this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be
considered to have arisen when the Defendants send the United States a written Notice of
Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal
negotiations shall not exceed thirty (30) days from the date the dispute arises, unless that period
is modified by written agreement.  If the Parties cannot resolve a dispute by informal
negotiations, then the position advanced by the United States shall be considered binding unless,
within forty-five (45) days after the conclusion of the informal negotiation period, the Defendants
invoke the formal dispute resolution procedures in Paragraph 43 of this Consent Decree.

43.     Formal Dispute Resolution.  The Defendants shall invoke formal dispute resolu-
tion procedures, within the time period provided in Paragraph 42 of this Consent Decree, by
serving on the United States a written Statement of Position regarding the matter in dispute.  The
Statement of Position shall include, but may not necessarily be limited to, any factual data,

-19-

analysis, or opinion supporting the Defendants' position and any supporting documentation relied upon by the Defendants.

44.    The United States shall serve its Statement of Position within forty-five (45) days of receipt of the Defendants' Statement of Position. The United States' Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on the Defendants, unless the Defendants file a motion for judicial review of the dispute in accordance with Paragraph 45 of this Consent Decree.

45.    The Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Paragraph 20 of this Consent Decree, a motion requesting judicial resolution of the dispute. The motion must be filed within ten (10) days of receipt of the United States' Statement of Position pursuant to the Paragraph 44 of this Consent Decree. The motion shall contain a written statement of the Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

46.    The United States shall respond to the Defendants' motion within the time period allowed by the Local Rules of this Court. The Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

47.    In any dispute brought under Paragraph 45 of this Consent Decree, Defendants shall bear the burden of demonstrating that their position clearly complies with and furthers the

-20-

objectives of this Consent Decree and the Act and that Defendants are entitled to relief under applicable law. The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law.

48.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of the Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated Penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 29 of this Consent Decree. If the Defendants do not prevail on the disputed issue, Stipulated Penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## X. RIGHT OF ENTRY/RECORDS RETENTION

49.    The United States, and its authorized representatives, upon presentation of appropriate credentials, shall have the right to enter any facility with information pertaining to this Consent Decree to:

a.  monitor the progress of activities required under this Consent Decree;

b.  verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.  obtain samples;

d.  obtain documentary evidence, including photographs and similar data; and

e.  assess Defendants' compliance with this Consent Decree.

50.    Until three years after the termination of this Consent Decree, Defendants shall retain, and instruct their contractors and agents to preserve, in a form suitable for inspection, all non-identical records related to (a) the implementation of the Export Plans required by Paragraph 8 or 9 of this Consent Decree, (b) the implementation of Nonroad Compliance Plans required by Paragraph 10 or 11 of this Consent Decree, (c) implementation of Emissions Testing required by Paragraphs 12 and 13 of this Consent Decree; (d) the implementation of Mitigation Projects required by Paragraph 14 of this Consent Decree, and (e) other information gathered by Defendants to carry out the requirements of this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

51.    All information and documents submitted by the Defendants to the United States pursuant to this Consent Decree shall be subject to public inspection, unless identified and supported as confidential business information by the Defendants in accordance with 40 C.F.R. Part 2.  Nothing herein shall be construed to require the Defendants to allow EPA access to documents protected by any applicable privilege.

52.    At the conclusion of the information-retention period provided in Paragraph 50, each Defendant shall notify the United States at least ninety (90) days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA.  Defendant may assert that certain documents, records, or

other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If a Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

      53.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of a Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XI.  **EFFECT OF DECREE**

      54.    This Consent Decree resolves the United States' civil claims for penalties and injunctive relief under Sections 203, 204, 205, and 213 of the Act, 42 U.S.C. §§ 7522, 7523, 7524, and 7547 for the violations alleged in the Complaint filed in this action through the date of lodging.  EPA's commitment under this Paragraph is expressly conditioned upon the satisfactory performance by Defendants of their obligations under this Consent Decree.

      55.    In consideration of the actions that will be performed by Defendants pursuant to Paragraph 14 of this Consent Decree (Mitigation Projects), EPA shall not base a determination under Section 207(c)(1) of the Act, 42 U.S.C. § 7541 and 40 C.F.R. § 90.808, that a substantial

number of the nonroad engines identified below do not conform to the regulations prescribed under Section 213 of the Act, 42 U.S.C. § 7524.

> a.  Subject Chainsaws; and
>
> b.  any engine family or group of nonroad engines identified in Paragraph 12 of this Consent Decree (Emissions Testing) that is determined to exceed the applicable emissions standards and for which the Defendants spend Additional Project Dollars to mitigate the excess emissions from the nonroad engines pursuant to Paragraph 14 of this Consent Decree (Mitigation Projects).

EPA's commitment under this Paragraph is expressly conditioned upon the satisfactory performance by Defendants of their obligations under this Consent Decree.

56.    This Consent Decree does not limit or affect the rights of the Defendants against each other or against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree, against the Defendants, except as otherwise provided by law.  Defendants reserve all rights against each other.

57.    This Consent Decree does not limit or affect the rights of the United States against any third parties not a party to this Consent Decree.

58.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII.  NON-WAIVER PROVISIONS

59.    This Consent Decree in no way affects or relieves the Defendants of any responsibility to comply with any federal, state, or local laws or regulations, and compliance with

this Consent Decree shall be no defense to any actions commenced pursuant to said laws and regulations.

60.    The United States reserves any and all legal and equitable remedies available to enforce the provisions of this Consent Decree.

61.    This Consent Decree shall not limit any authority of EPA under the Act or any applicable statute, including the authority to seek information from the Defendants or to seek access to the property of the Defendants.  The United States reserves all remedies available to it for violations of the Act by the Defendants that are not alleged in the Complaint as well as for violations of the Act by the Defendants that occur after the date of lodging of this Consent Decree.

62.    This Consent Decree does not resolve criminal liability, if any, that any person might have for violations of the Act or any other law.

63.    Nothing in this Consent Decree shall be construed to limit the authority of the United States to undertake any action against any person, including, in response to conditions that may present an imminent and substantial endangerment to the environment or to the public health or welfare.

### XIII.  COSTS OF SUIT

64.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by the Defendants.  Notwithstanding the above, Defendants do not

waive any claims against each other for indemnification and/or contribution which may include such costs and attorneys' fees.

## XIV. MODIFICATION

65.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

## XV. PUBLIC COMMENT AND ENTRY OF CONSENT DECREE

66.     This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment. In accordance with Department of Justice policy, the United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. This Paragraph does not create any rights exercisable by the Defendants.

67.     The Defendants consent to the entry of this Consent Decree without further notice.

## XVI. TERMINATION

68.     The Defendants may, at any time after five (5) years from the Effective Date of this Consent Decree, serve upon the United States, together with all necessary supporting documentation, a Request for Termination of this Consent Decree stating that the Defendants have:

a. made the payment required by Paragraph 21 and any accrued Interest imposed by this Consent Decree;

b.  paid in full any stipulated penalties imposed by this Consent Decree; and

c.  completed all other requirements of this Consent Decree.

69.     Following receipt by the United States of the Defendants' Request for
Termination, the Parties shall confer informally concerning the Request and any disagreement
that the Parties may have as to whether the Defendants have satisfactorily complied with the
requirements for termination of this Consent Decree.  If the United States agrees that the Decree
may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation
terminating the Decree.

70.     If the United States does not agree that the Decree may be terminated, the
Defendants may invoke Dispute Resolution under Section IX (Dispute Resolution) of this
Decree.  However, the Defendants shall not seek Dispute Resolution of any dispute regarding
termination until ninety (90) days after service of its Request for Termination.

## XVII.  SIGNATORIES/SERVICE

71.     Each undersigned representative of the Defendants, EPA, and the Assistant
Attorney General for the Environment and Natural Resources Division of the Department of
Justice certifies that he or she is fully authorized to enter into the terms and conditions of this
Consent Decree and to execute and legally bind the Party he or she represents to this document.
This Consent Decree may be signed in counterparts, and its validity shall not be challenged on
that basis.

72.     The Defendants agree not to oppose entry of this Consent Decree by the Court or
to challenge any provision of the Decree, unless the United States has notified the Defendants in
writing that it no longer supports entry of the Decree.

-27-

73.    The Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XVIII.    INTEGRATION

74.    This Consent Decree, including the Appendices identified or incorporated herein, constitutes the final, complete, and exclusive agreement and understanding between the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than the Decree (including the Appendices), no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents.

## XIX.    FINAL JUDGMENT

75.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and the Defendants.

## XX. RETENTION OF JURISDICTION

76.    This Court shall retain jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and for the purpose of adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree, to the extent that this Consent Decree provides for resolution of disputes by the Court.

## XXI.    APPENDICES

77.    The following appendices are attached to and incorporated into this Consent

Decree:

"Appendix A" is the List of Subject Chainsaws,

"Appendix B" is the MTD Inventory Tracking and Export Plan,

"Appendix C" is the  Jenn Feng/McCulloch Inventory Tracking and Export Plan,

"Appendix D" is the  Jenn Feng and McCulloch Nonroad Compliance Plan,

"Appendix E" is the MTD Nonroad Compliance Plan,

"Appendix F" is the Jenn Feng and McCulloch Test Plan, and

"Appendix G" is the description of Mitigation Projects.

SO ORDERED AND APPROVED in accordance with the foregoing this _26th_ day of

_June_ , 2008.

United States District Judge

-29-

**Signature Page – United States v McCulloch Corporation, Jenn Feng Industrial Co. Ltd. and MTD Products Inc**

FOR PLAINTIFF, UNITED STATES OF AMERICA


Dated 4/18/08

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, DC 20530


Dated 7/2/08

CATHERINE BANERJEE ROJKO
Senior Attorney
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
202.514.5315
202.616.6584 (fax)

-30-

Signature Page – United States v McCulloch Corporation, Jenn Feng Industrial Co. Ltd. and MTD Products Inc


Dated: April 9, 2008

GRANTA Y. NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460


Dated: March 14, 2008

ADAM M. KUSHNER
Director
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
1200 Pennsylvania Avenue, N.W.
Mailcode 2242A
Washington, D.C. 20460


Dated: 2/29/08

JEFFREY A. KODISH
Attorney Advisor
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Mobile Sources Enforcement Branch
12345 W. Alameda Parkway, Suite 214
Denver, CO 80228

-31-

**Signature Page – United States v McCulloch Corporation, Jenn Feng Industrial Co. Ltd. and MTD Products Inc**

FOR DEFENDANT, JENN FENG INDUSTRIAL CO. LTD.

_____  Dated: Feb. 25, 2008

DAVID JONG
Jenn Feng Industrial Co., Ltd.
No. 19 Lane 118
Sec. 2 Min Tau Rd.
Ping Chang City,
Taoyuan, Taiwan, R.O.C.

_____  Dated: 28 Feb, 2008

FRANCIS X. LYONS, ESQ.
THOR W. KETZBACK, ESQ.
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3300
Chicago, Illinois  60602

**Signature Page – United States v McCulloch Corporation, Jenn Feng Industrial Co. Ltd. and MTD Products Inc**

FOR DEFENDANT, McCULLOCH CORPORATION

Dated: _Feb. 25. 2008_

DAVID JONG
Jenn Feng Industrial Co., Ltd.
No. 19 Lane 118
Sec. 2 Min Tau Rd.
Ping Chang City,
Taoyuan, Taiwan, R.O.C.

Dated: _28 Feb, 2008_

FRANCIS X. LYONS, ESQ.
THOR W. KETZBACK, ESQ.
Bell , Boyd & Lloyd LLP
70 West Madison Street
Suite 3300
Chicago, Illinois 60602

-33-

**Signature Page – United States v McCulloch Corporation, Jenn Feng Industrial Co. Ltd. and MTD Products Inc**

FOR DEFENDANT, MTD PRODUCTS INC

Dated: 3/12/08

ROBERT T. MOLL
MTD Products Inc
P.O. Box 368022
Cleveland, OH 44136-9722

Dated: 3/13/08

RICHARD T. COYNE, ESQ.
Wegman, Hessler & Vanderburg
6055 Rockside Woods Blvd., #200
Cleveland, Ohio  44131

-34-

**Signature Page – United States v McCulloch Corporation, Jenn Feng Industrial Co. Ltd. and MTD Products Inc**

FOR DEFENDANT, MTD SOUTHWEST INC


Dated: 03/11/2008

PHILLIP G. CLOUSE
MTD Southwest Inc
9235 S. McKemy
Tempe, AZ 85284


Dated: 3-11-08

RICHARD T. COYNE, ESQ.
Wegman, Hessler & Vanderburg
6055 Rockside Woods Blvd., #200
Cleveland, Ohio 44131

-35-

**Appendix A**

**List of Subject Chainsaws**

**2005 50 cc chainsaws**
**Engine Family: 5MHXS.0505AA**

| MTD MODEL NO. | BJ Label Series No.[1] |
|---|---|
| 41AY80AR977 | 508B0100001~508B0102000 |
| 41AY00AS977 | 509B0300091~509B0300590 |
| 41AY08AR966 | 508B0102001~508B0102500 |
| 41AY00AR966 | 508B0102501~508B0102762<br>509B0300051~509B0300090 |
| | 509B0300601~509B0300900 |
| | 511B0201081~511B0201580 |
| 41AY80AR977 | 603B0103385~603B0104400 |
| | 606B0100001~606B0101300 |
| | 606B0101301~606B0102430 |
| 41AY00AS977 | 602B0109441~602B0109940 |

---

[1] As a result of differences between Jenn Feng's and MTD's records management systems, the BJ numbers in this Appendix A may not precisely correspond to the BJ numbers of the chainsaws exported by Defendants pursuant to this Consent Decree.

|  | 603B0200001~603B0200250 |
|---|---|
|  | 604B0208801~604B0209060 |
| 41AY00AS977 | 606B0103051~606B0103550 |
| 41AY08AR966 | 604B0205001~604B0205510 |
| 41AY00AR966 | 512B0200501~512B0202500 |
|  | 601B0100003~601B0101020 |

**Total 2005 MY 50 cc chainsaws: 12,500**

**2006 50 cc chainsaws**
**Engine Family: 6MHXS.0505AA**

| 41AY00AR966 | 606B0102431~606B0103050<br>606B0103551~606B0103950 |
|---|---|
| 41AY52AR902 | 607B0510061~607B0510800 |
|  | 607B0510801~607B0511540 |
|  | 608B0211551~608B0212280 |

**Total 2006 MY 50 cc chainsaws: 3,190**

**2005 55 cc chainsaws**
**Engine Family: 5MHXS.0555AA**

| MTD MODEL NO. | BJ Label Series No. |
|---|---|
| 41AY85AR799 | 412B0205621~412B0206120<br>412B0206621~412B0209620 |

| | |
|---|---|
| | 412B0210121~412B0210620 |
| | 412B0209621~412B0210120 |
| | 502B0306001~502B0307000 |
| | 503B0104261~503B0105060 |
| | 503B0301183~503B0302882<br>503B0302901~503B0304400<br>503B0305001~503B0307000 |
| | 503B0307001~503B0307400<br>505B0900017~505B0900116<br>505B0200501~505B0201500<br>505B0900517~505B0905516 |
| | 505B0900117~505B0900516<br>505B0201501~505B0201600 |
| | 506B0112625~506B0113024<br>506B0108001~506B0112624<br>506B0113125~506B0113234 |
| | 507B0301063~507B0306062<br>507B0306101~507B0310100<br>508B0300001~508B0303000<br>508B0308621~508B0311620 |

| | |
|---|---|
| | 507B0201001~507B0205000<br>508B0118001~508B0118500<br>509B0100001~509B0104500<br>509B0104507~509B0105506<br>509B0106021~509B0106520<br>509B0107007~509B0107506<br>509B0108507~509B0108606 |
| | 509B0107507~509B0108506<br>509B0108651~509B0111650<br>510B0100001~510B0101000<br>510B0104311~510B0104322 |
| 41AY85AR799 | 601B0205563~601B0208282<br>601B0208283~601B0208682 |
| | 603B0100001~603B0101500<br>603B0101885~603B0103384 |
| | 604B0100001~604B0103030<br>604B0103031~604B0104030<br>604B0105181~604B0107180<br>605B0100001~605B0101060<br>605B0101201~605B0101350 |
| | 604B0201001~604B0202900<br>604B0203001~604B0204848<br>604B0205511~604B0206800<br>604B0206801~604B0208800<br>605B0200001~605B0201768<br>605B0202001~605B0202300<br>605B0101351~605B0102596<br>605B0102851~605B0103538<br>605B0104191~605B0104434<br>605B0105483~605B0108330<br>605B0305401~605B0309400<br>605B0309901~605B0310900 |
| | 606B0400001~606B0400740 |

| 41CY85AR799 | 606B0400001~606B0404300<br>606B0404301~606B0409300<br>607B0100001~607B0105000<br>607B0200001~607B0204500<br>607B0205001~607B0205500 |
|---|---|
| 41AY05AR799 | 606B0107501~606B0112500<br>606B0112501~606B0117500 |

**Total 2005 MY 55 cc chainsaws: 116,700**

**2006 55 cc chainsaws**
**Engine Family: 6MHXS.0555AA**

| 41CY85AR799 | 607B0105001~607B0109000<br>607B0205501~607B0209500 |
|---|---|
| | 607B0114771~607B0116770<br>608B0201201~608B0202200<br>608B0200001~608B0200796 |
| | 608B0104951~608B011450 |
| | 609B0209201~609B0209430<br>609B0209701~609B0212500<br>609B0213531~609B0215530<br>610B0200001~610B0201500 |
| | 610B0201501~610B0202500<br>610B0203501~610B0204000<br>610B0204501~610B0204830<br>610B0206051~610B0206550<br>610B0208551~610B0208790<br>610B0209051~610B0209400<br>610B0209811~610B0210870<br>610B0211221~610B0213340<br>610B0213371~610B0214200 |

| | |
|---|---|
| | 610B0216221~610B0217020<br>610B0215821~610B0216220<br>611B0206311~611B0207150 |
| | 608B0119151~607B0119750<br>608B0120151~607B0123550 |
| | 607B0110651~607B0112530<br>607B0112651~607B0114770<br>608B0101001~608B0102000 |
| 41AY05AR799 | 608B0111501~608B0112360<br>608B0113001~608B0115640<br>608B0116141~608B0118140<br>608B0118641~608B0119140<br>609B0205201~609B0209200<br>609B0212501~609B0213500 |
| | 608B0212781~608B0216780 |
| | 610B0100001~610B0101500<br>610B0103501~610B0105020 |
| | 610B0216221~610B0217020<br>610B0215821~610B0216220<br>611B0105031~611B0105330<br>611B0105544~611B0106043 |

**Total 2006 MY 55 cc chainsaws:  66,500**

**Appendix B**

**MTD Products Inc and MTD Southwest Inc**
**Inventory Tracking and Export Plan**

This Inventory Tracking and Export Plan ("Export Plan") covers 71,761 of the Subject Chainsaws, as defined in Paragraph 3(p) of the Consent Decree, that are located at the following warehouses in the following quantities:

| PART # | TUCSON, AZ WAREHOUSE QTY | GILA, AZ WAREHOUSE QTY | TOTAL QTY |
|---|---|---|---|
| 41AY85AR799 | 299 | 155 | 454 |
| 41BY85AR799 | 0 | 4,004 | 4,004 |
| 41CY85AR799 | 51,054 | 412 | 51,466 |
| 41AY05AR799 | 5,808 | 6,272 | 12,080 |
| 41AY08AR966 | 541 | 0 | 541 |
| 41AY00AR966 | 27 | 30 | 57 |
| 41BY00AR966 | 0 | 0 | 0 |
| 41AY80AR977 | 2,361 | 0 | 2,361 |
| 41AY00AS977 | 73 | 0 | 73 |
| 41AY52AR902 | 0 | 725 | 725 |
| **Grand Total** | | | **71,761** |

Prior to lodging of this Consent Decree, MTD Products Inc and MTD Southwest Inc (collectively referred to as "MTD") exported 10,601 of the Subject Chainsaws in accord with the terms of this Export Plan.

MTD shall export the chainsaws that are covered by this Export Plan from the United States to a country outside of North America in accord with this Export Plan. MTD shall also export any other engines that are in its possession and control in accord with this Export Plan if the engines are determined to exceed the applicable emissions standards under the testing program set forth in Paragraph 12 and Appendix F of the Consent Decree.

MTD shall maintain custody and control of the Subject Chainsaws until such time as they are shipped for export. MTD has, and shall continue to, secure and segregate the chainsaws that are covered by this Export Plan from other products in MTD's warehouses.

The Defendants identified the Subject Chainsaws with bar code labels. These bar code labels are referred to as a "BJ labels." The product model numbers and BJ serial number are encoded in the bar code on each BJ label. MTD shall track each chainsaw that it exports by model number, BJ serial number and engine family number, and certify to EPA the BJ serial number and engine family number of each chainsaw exported. MTD shall also provide EPA on

1

a quarterly basis with a spreadsheet identifying the BJ serial number, model number and engine family number of each chainsaw exported.

MTD shall also maintain all customary transactional documents regarding the export of the Subject Chainsaws, including but not limited to customer name, address, quantity, identification of the port from which the chainsaws were exported and the name of the carrier used to export the chainsaws. MTD shall institute a quality assurance procedure whereby it will spot check pallets and photograph sample chainsaws and BJ labels to ensure that BJ numbers from the chainsaws loaded in the shipping containers correspond to BJ serial numbers recorded on the customer export documents.

MTD shall engage a freight forwarding company and exporter to facilitate the exportation of the Subject Chainsaws. MTD shall inform each customer that purchases the Subject Chainsaws, in writing, that the chainsaws do not meet EPA standards and may not be sold in the United States, Mexico or Canada. MTD shall label all shipping containers that hold the Subject Engines "for export only."

**Appendix C**

**Jenn Feng Industrial Co. Ltd./McCulloch Corporation
Inventory Tracking and Export Plan**

This Inventory Tracking and Export Plan ("Export Plan") covers 8,366 of the Subject Chainsaws (as defined in Paragraph 3(p) of the Consent Decree) that are located at the following warehouses in the following quantities:

| PART # | EDEN, NC WAREHOUSE QTY | LA, CA WAREHOUSE QTY | TUCSON, AZ WAREHOUSE QTY | TOTAL QTY |
|---|---|---|---|---|
| 41AY05AR799 | 1,062 | 0 | 0 | 1,062 |
| 41BY05AR799 | 2 | 649 | 1,910 | 2,561 |
| 41AY85AR799 | 334 | 171 | 0 | 505 |
| 41BY85AR799 | 558 | 1,170 | 2,480 | 4,208 |
| **Grand Total** | **1,956** | **1,990** | **4,390** | **8,366** |

Prior to lodging of this Consent Decree, Jenn Feng Industrial Co. Ltd. ("Jenn Feng") and McCulloch Corporation ("McCulloch") exported 7,891 of the Subject Chainsaws in accord with the terms of this Export Plan.

Jenn Feng and McCulloch shall export the remaining chainsaws that are covered by this Export Plan from the United States to a country outside of North America in accord with this Export Plan. Jenn Feng and McCulloch shall also export any other engines that are in their possession and control in accord with this Export Plan if the engines are determined to exceed the applicable emissions standards under the testing program set forth in Paragraph 12 and Appendix F of the Consent Decree.

Jenn Feng and McCulloch shall maintain custody and control of the Subject Chainsaws until such time that they are shipped for export. The chainsaws must be secured and segregated from other products.

The Defendants identified the Subject Chainsaws with bar code labels. These bar code labels are referred to as a "BJ labels." The product model numbers and BJ serial number are encoded in the bar code on each BJ label. Jenn Feng and McCulloch shall track each chainsaw that it exports by BJ number and engine family number, and certify to EPA the BJ number and engine family number of each chainsaw exported. Jenn Feng and McCulloch shall also provide EPA on a quarterly basis with a spreadsheet identifying the BJ number, serial number and engine family number of each chainsaw exported.

Jenn Feng and McCulloch shall also maintain all customary transactional documents regarding the export of the Subject Chainsaws, including but not limited to customer name,

address, quantity, identification of the port from which the chainsaws were exported and the name of the carrier and vessel used to export the chainsaws. Jenn Feng and McCulloch shall institute a quality assurance procedure whereby they will spot check pallets and photograph sample chainsaws and BJ labels to ensure that BJ numbers from the chainsaws loaded in the shipping containers correspond to serial numbers on the recorded export documents.

Jenn Feng and McCulloch have engaged SES International Express, Inc. ("SES") to facilitate the exportation of the Subject Chainsaws. Jenn Feng and McCulloch shall inform each person that purchases the Subject Chainsaws, in writing, that the chainsaws do not meet EPA standards and may not be sold in the United States, Mexico or Canada. Jenn Feng and McCulloch shall label all shipping containers that hold the Subject Engines "for export only."

**Appendix D**

**Jenn Feng Industrial Co. Ltd. and McCulloch Corporation Nonroad Compliance Plan**

In addition to complying with all applicable federal laws regarding the importation of nonroad engines into the United States, including 40 C.F.R. Part 90 ("Nonroad Regulations"), Jenn Feng Industrial Co. Ltd. ("Jenn Feng") and McCulloch Corporation ("McCulloch") shall, within ninety (90) days of the Effective Date of this Consent Decree, establish and implement the following procedures to ensure compliance with the Nonroad Regulations with respect to all nonroad engines manufactured by Jenn Feng and/or certified by McCulloch for distribution or sale in the United States, except for small quantities of nonroad equipment engines covered by an exemption set forth in 40 C.F.R. Part 90, Subpart J, that are imported as engineering samples intended for development projects or as part of the pre-testing and evaluation process, and that are not imported for sale in the United States.

**1. Establishment of Nonroad Compliance Group**

Jenn Feng and McCulloch shall jointly establish a Nonroad Compliance Group ("NRCG") to oversee the implementation of this Nonroad Compliance Plan ("Plan"). The NRCGs shall be made up of the Jenn Feng and McCulloch company representatives described within Paragraph 11 of this Appendix. The NRCGs shall meet at least quarterly to review, certify and report compliance with this Plan. The NRCGs shall promptly take all steps necessary to stop any ongoing and prevent future violations of the Nonroad Regulations, report any violations of the Nonroad Regulations to EPA, and correct any noncompliance.

**2. Certification and Correlation Testing**

Jenn Feng and McCulloch shall conduct certification emissions tests for all 2008 MY engines certified by McCulloch or any entity owned or controlled by Jenn Feng at a qualified United States emissions laboratory. Correlation emissions testing shall also be conducted at the Jenn Feng laboratory in Taiwan for 2008 MY engines. Certification testing for 2009 and later model years shall also be conducted at a qualified United States emissions laboratory, unless and until McCulloch and Jenn Feng demonstrate that Jenn Feng's emissions laboratory has implemented and maintained a quality control/quality assurance ("QA/QC") program in accordance with Paragraph 3 of this Plan, and produces credible data as set forth in this paragraph of this Appendix D to demonstrate the reliability of its test results. Jenn Feng shall submit the results of its correlation emissions testing to demonstrate the reliability of the Jenn Feng laboratory in Taiwan in order to obtain approval from EPA to conduct certification emissions testing for 2009 and later model years in Taiwan. Reports on correlation test results and QA/QC program implementation and documentation shall be used to demonstrate Jenn Feng's laboratory has an adequate QA/QC program, it has the capability to generate reliable test data, and is qualified to carry out certification-grade emissions testing.

1

3. **Standard Operation Procedures**

Jenn Feng shall develop and implement standard operating procedures ("SOPs") to ensure compliance with the emission testing requirements in 40 C.F.R. Part 90 and QA/QC laboratory practices to enhance Jenn Feng's existing QA/QC program. The SOPs shall include, at minimum, SOPs for dynamometer and analyzer calibrations and checks; calibration gas management; engine set up and test preparation; emission testing; and data analysis and reporting and record-keeping. The SOP implementation shall include conducting SOP training to provide an overview of applicable engine regulations and test procedures; overview of scientific basis of emissions measurement laboratories and their operations; discussion and implementation of SOPs via hands-on demonstration; emissions testing demonstration; and data analysis and reporting.

4. **Production Line Testing Program**

Jenn Feng and McCulloch shall conduct all Production Line Testing ("PLT Testing") pursuant to 40 C.F.R. Part 90, Subpart H for 2007 and 2008 MY engines certified by McCulloch or any entity owned or controlled by Jenn Feng at its emissions laboratory and at a qualified United States emissions laboratory. All PLT Testing for 2009 and later MY engines shall also be conducted at its emissions laboratory and at a qualified United States emissions laboratory, unless and until McCulloch and Jenn Feng demonstrate that Jenn Feng's emissions laboratory has adequate QA/QC procedures in place and can produce sufficient data to demonstrate reliable test results in accordance with Paragraphs 2 and 3 of this Appendix. The test results from the United States laboratory shall constitute the official test results for the purpose of complying with 40 C.F.R. Part 90, Subpart H. Jenn Feng shall conduct correlation emissions testing as described within Paragraph 2 of this Appendix in order to obtain approval from EPA to conduct production line emissions testing for 2009 and later model years within Jenn Feng's laboratory.

5. **Voluntary In-Use Testing**

If Jenn Feng or McCulloch elects to conduct any Voluntary In-Use Testing pursuant to 40 C.F.R. Part 90, Subpart M for 2008 MY engines certified by McCulloch or any entity owned or controlled by Jenn Feng, the testing shall be conducted at a qualified United States emissions laboratory. Any Voluntary In-Use Testing for 2009 and later MY engines must also be conducted at a qualified United States emissions laboratory, unless and until McCulloch and Jenn Feng demonstrate that Jenn Feng's emissions laboratory has adequate QA/QC procedures in place and can produce sufficient data to demonstrate reliable test results in accordance with Paragraph 2 of this Appendix.

6. **Production Line Compliance - Running Changes**

A. Jenn Feng and McCulloch shall assure that all engines designated for export to the United States conform in all material respects to the design specifications of the certification test engine.

B.  A representative of the joint NRCG shall monitor production line activities and ensure that a valid running change is submitted to EPA for any engines that are to be added to a certificate of conformity, any Family Emission Limit ("FEL") that is to be changed, or for any changes that are to be made to a product line covered by a certificate of conformity.

C.  For each production line change in any certified engine, a representative of the joint NRCG shall make a written determination regarding whether or not a running change must be submitted to EPA.  These determinations shall be reviewed by the entire NRCG at each quarterly meeting.

7. **Export Verification Process**

A.  Jenn Feng and McCulloch shall create a "Certification List," which shall identify all EPA-certified engines by engine family and models and shall contain sample emission labels.  The Certification List shall also include the component list and design specifications for each certification test engine.  It shall be updated weekly.

B.  Jenn Feng and McCulloch shall create an Export Compliance Evaluation Sheet with a separate file for each export shipment of engines to the United States.

C.  Daily Pre-Export Audit  - Jenn Feng and McCulloch shall use the current Certification List to verify that each shipment contains only EPA-certified engines, that the correct label is on the engines and properly affixed by inspecting all shipping papers and an appropriately representative sample of at least one percent (1.0%) of the engines from each shipment.

D.  Monthly Pre-Export Audit - At least once per month, Jenn Feng and McCulloch shall select one appropriately representative engine from each shipment, disassemble the engines, and verify that the components and design parameters of the engine are consistent with the information on the Component List.

E.  Jenn Feng and McCulloch shall document each Pre-Export Audit with the written Compliance Evaluation Sheet, including a comparison of the model number, emissions labels, component list and design specifications with information from the Certification List.  Photos of engines and labels shall be retained.

F.  Except as otherwise provided for within this Appendix or the Consent Decree, if units have entered into the export process that are not in compliance with the Nonroad Regulations, the joint NRCG shall take actions to ensure those units do not enter into the United States.  If the units have already entered the United States, the NRCG shall immediately notify EPA of the noncompliance and stop the further distribution or sale of affected units prior to retail sale in the United States.

G. In order to have Jenn Feng and McCulloch products available for sale within the United States market to meet seasonal demands, Jenn Feng shall reserve the right to ship its products to the United States prior to receiving PLT testing results from United States laboratory(ies). Those products shall be stored in a McCulloch warehouse in the United States and shall not be released for sale within the United States until PLT testing results from United States laboratory(ies) confirm compliance with EPA's Nonroad Engine Regulations. Jenn Feng shall follow all other requirements of this Appendix and Consent Decree relating to the above-mentioned products.

H. Jenn Feng and McCulloch shall assure that all nonroad engines exported to the United States are accompanied and covered by a properly completed EPA Import Declaration Form 3520-21.

## 8. Creation of Nonroad Compliance Hotline

Jenn Feng and McCulloch shall establish a Nonroad Compliance Hotline that will allow its employees and other interested persons to submit confidential, anonymous information about Jenn Feng and/or McCulloch's compliance with the Nonroad Regulations. Within three (3) business days after receiving any call relating to potential compliance issues regarding the Nonroad Regulations, an incident report detailing each call must be communicated in writing to the NRCG and an investigation must be commenced.

## 9. Training and Memos to Staff

Jenn Feng and McCulloch shall provide training to all staff involved with carrying out this Plan on at least a quarterly basis. The training shall include a review of the procedures set forth in this Plan and updates on any relevant compliance issues. Each member of Jenn Feng's and McCulloch's staff involved in carrying out this Plan shall certify that they have participated in the training, received a copy of this Plan, were informed of the Nonroad Compliance Hotline, and recognize that violations of the Nonroad Regulations can result in the imposition of significant civil penalties.

## 10. Certified Quarterly Reports

Jenn Feng and McCulloch shall submit quarterly status reports to EPA within forty-five (45) days after the close of each calendar year quarter (i.e., by May 15, August 15, November 15, and February 15) following the Effective Date of this Consent Decree. Each Quarterly status report shall include:

A. The total number of engines in each engine family imported to the United States.

B. A summary of all emissions test reports.

C. A summary of all incident reports from the Compliance Hotline, including an explanation of actions taken to address each incident.

4

D. Identify any engines that are added to a certificate of conformity, any changes to FELs, or any changes made to a product line covered by a certificate of conformity.

E. A summary of the pre-export audit reports as set forth in Paragraph 7 of this Appendix.

## 11. Nonroad Compliance Group

Jenn Feng and McCulloch's NRCG shall consist of their respective President, Vice President of Engineering, QA/QC managers and section chiefs of the production and emissions sections. Key roles and responsibilities of each member of each NRCG are identified below:

A. The President shall: (1) assure overall corporate awareness of the importance of the Nonroad Compliance Plan; and (2) provide necessary assistance to the NRCG.

B. The Vice President of Engineering shall: (1) assure the execution of overall Plan; and (2) communicate with the Government and United States laboratory(ies).

C. The Safety and Compliance Section Chief shall: (1) plan and schedule the quarterly Nonroad Compliance Plan training program; (2) update weekly certification list; (3) prepare quarterly reports to EPA; and (4) prepare Import Form 3520-21.

D. The QA Managers shall: (1) assure Nonroad Compliance Plan is properly executed in manufacturing facilities; (2) plan and hold monthly meetings; and (3) maintain record-keeping.

E. The Emission Laboratory Section Chief shall: (1) assure all calibrations are properly executed and records are current; (2) assure all test procedures are compliance with SOPs; and (3) maintain records.

F. The Production QC Section Chief shall: (1) assure production line quality control and testing requirements; (2) execute daily and monthly audits; and (3) prepare and maintain export compliance evaluation sheets.

**Appendix E**

**MTD Products Inc and MTD Southwest Inc Nonroad Compliance Plan**

In addition to complying with all applicable federal laws regarding the importation of nonroad engines into the United States, including 40 C.F.R. Part 90 ("Nonroad Regulations"), MTD Products Inc ("MTD") and MTD Southwest Inc ("MTDSW") shall, within ninety (90) days of the Effective Date of this Consent Decree, enhance their existing systems for ensuring compliance with the Nonroad Regulations by implementing the following procedures set forth in this Nonroad Compliance Plan ("Compliance Plan" or "Plan"). The Plan shall apply to all handheld equipment engines imported into the United States by MTD or MTDSW, except for 1) handheld equipment engines that are manufactured by MTD Consumer Products Mexico, S.A., if these engines are also certified by MTD or MTDSW and all certification emissions tests and Production Line Tests, referenced in Paragraph 3(C) below, are conducted at a qualified emissions laboratory located in the United States, and 2) small quantities of handheld equipment engines imported as engineering samples intended for development projects or as part of the pre-testing and evaluation vendor approval process, and that are not imported for sale in the United States.

1. **Definitions**

   A. For the purpose of this Compliance Plan, the term "Test Lot" shall mean a quantity of handheld engines manufactured consecutively from the same production line with the same components and specifications. MTD and MTDSW shall create a new Test Lot for each engine family at least once per month or when the number of handheld engines manufactured consecutively from the same production line with the same components and specifications exceed 9,999 units, whichever occurs first.

   B. For the purpose of this Compliance Plan, the term "Critical Emission Control Components" shall mean the spark plug, carburetor / mixer assembly, catalyst, and any other part number listed by the engine manufacturer in response to question number 57 in the EPA certification application.

2. **Establishment of Nonroad Compliance Group**

   MTD and MTDSW shall each establish a Nonroad Compliance Group ("NRCG") to oversee the implementation of this Plan as it pertains to each company. The NRCGs shall be made up of the company representatives described within Paragraph 8 of this Appendix. Each NRCG shall meet at least quarterly to review, certify and report compliance with this Plan. Each NRCG shall promptly take all steps necessary to stop any ongoing violations and prevent future violations of the Nonroad Regulations, report any violations of the Nonroad Regulations to EPA, and correct any noncompliance.

### 3. Pre-Import Program

A. All contracts for the purchase and importation of handheld engines manufactured outside of the United States for sale or distribution into the United States shall specify that the engines must be certified, properly labeled, and meet applicable emissions standards. The contracts shall also require the engine supplier to send copies of all EPA Certificates of Conformity and running changes relating to the imported engines to either MTD or MTDSW as applicable.

B. Prior to importing any handheld engines, MTD and MTDSW shall obtain, in writing or in electronic form, the name and contact information of the person employed by the engine supplier who is charged with ensuring compliance with the Nonroad Regulations. This person shall be referred to as the "Supplier's Compliance Officer."

C. Prior to accepting any engine family for sale or distribution in the United States, MTD or MTDSW shall physically inspect at least one engine from the engine family to verify that it is covered by a certificate of conformity, and that the correct emissions label is on the engine and is properly affixed. MTD or MTDSW shall also conduct emissions tests on one sample engine, and compare the results to the applicable emissions standards. If the results exceed the emissions standards, MTD or MTDSW shall either 1) reject the engine family and cancel the contract to purchase the handheld engines; or 2) test additional engines in accordance with the Production Line Testing (PLT) procedures set forth in 40 C.F.R. Part 90, Subpart H. If the results still exceed the emissions standards, MTD and MTDSW shall report test results to EPA in accordance with 40 C.F.R. 90.709, and shall not import or sell any engine family that fails to comply with the criteria for PLT testing set forth in 40 C.F.R. 90.710.

D. For each Test Lot, the following information shall be obtained by MTD, in writing or in electronic form, from the supplier before the first shipment from the Test Lot leaves the export facility:

   1) the engine family name (number),
   2) the supplier's model number for the engine family,
   3) the EPA certificate number for the engine family,
   4) a photograph of an appropriately representative sample of an engine from the shipment,
   5) a photograph of an appropriately representative sample of the emissions information label from the engine family in the shipment,
   6) a list of Critical Emissions Control Components, and
   7) a certified statement from the Supplier's Compliance Officer confirming that each handheld engine in the Test Lot is certified, properly labeled and meets the applicable emissions standards.

2

4. **Import Verification Process**

A. Both MTD and MTDSW shall create a "Certification List." The Certification List shall identify all handheld engines imported by MTD and MTDSW, respectively, by engine family and models. The Certification List shall also contain sample emission labels provided by the manufacturer and utilized in the application for the Certificates of Conformity. This Certification List shall be updated weekly to verify that the information is consistent with the information available on EPA's certification database and information obtained from the engine supplier.

B. Both MTD and MTDSW shall create an Import Compliance Evaluation Sheet in a separate file for each Test Lot imported by MTD and MTDSW, respectively.

C. MTD and/or MTDSW shall evaluate all shipping papers from each shipment of handheld engines to verify that the shipment contains handheld engines covered by an EPA Certificate of Conformity and are covered by a properly completed EPA Import Declaration Form 3520-21.

D. MTD or MTDSW shall examine at least three (3) appropriately representative sample handheld engines selected from each Test Lot and verify that EPA has issued a Certificate of Conformity that covers the engine family in the Test Lot, that the correct label is on the engine(s) and is consistent with the EPA approved label, and the label is properly affixed. MTD or MTDSW shall within seventy-two (72) hours inform EPA if this examination reveals any compliance issues, and provide EPA with a proposed plan for addressing any potential compliance issue relating to the engines.

E. MTD or MTDSW shall conduct emission tests on at least two (2) appropriately representative sample handheld engines from the first shipment of each Test Lot and compare results to the applicable emission standards. MTD or MTDSW shall within seventy-two (72) hours provide copies of any test results that exceed the applicable emissions standards to EPA, along with a proposed plan for addressing any potential compliance issue relating to the engines.

F. MTD or MTDSW shall disassemble at least one (1) sample engine from each Test Lot and verify that the components and design parameters of the engines are consistent with the Critical Emission Control Components identified by the engine supplier. MTD or MTDSW shall within seventy-two (72) hours inform EPA of any differences between the components and design parameters of the disassembled engines and the information regarding the Critical Emission Control Components identified by the engine supplier, along with a proposed plan for addressing any potential compliance issue relating to the engines.

3

**5. Creation of Nonroad Compliance Hotline**

Both MTD and MTDSW shall establish a Nonroad Compliance Hotline that will allow its employees and other interested persons to submit confidential, anonymous information about each company's compliance with the Nonroad Regulations. Within three (3) business days after receiving any call relating to potential nonroad compliance issues, an incident report detailing each call must be communicated to the NRCG and an investigation must be commenced.

**6. Staff Training Program**

Both MTD and MTDSW shall provide training to all staff involved with carrying out this Plan on at least a quarterly basis. The training shall include a review of the procedures set forth in this Plan and updates on any relevant compliance issues. Each member of each company's staff involved in carrying out this Plan shall certify that they have participated in the training, received a copy of the Plan, were informed of the Nonroad Compliance Hotline, and recognize that violations of the Nonroad Regulations can result in the imposition of significant civil penalties.

**7. Certified Quarterly Reports**

Both MTD and MTDSW shall submit quarterly status reports to EPA within thirty (30) days after the close of each calendar year quarter (i.e., by April 30, July 30, October 30, January 30) following the Effective Date of this Consent Decree. Each Quarterly status report shall include:

    A. The total number of nonroad engines in each Test Lot for each engine family imported under this Plan.

    B. Detailed information regarding the implementation of the Pre-Import Program.

    C. Detailed information regarding the implementation of the Import Verification Process, including a summary of all emissions test reports.

    D. A summary of all incident reports from the Compliance Hotline, including an explanation of actions taken to address each incident.

    E. A summary of all emissions test results.

**8. Nonroad Compliance Group**

MTD's and MTDSW's NRCG shall consist of their respective President, Vice President of Product Engineering, Compliance Manager, Incoming Quality Manager, Project Manager and Accounting/Transportation Manager, or persons with similar designations. Key roles and responsibilities of each member of each NRCG are identified below:

4

A. **President MTD and MTDSW Shall:**

    1.    Be responsible for coordinating and conducting the activities of the NRCG;

    2.    Schedule and preside over each meeting and delegate duties and responsibilities as necessary; and

    3.    Be responsible for implementing and administering the Consent Decree.

B. **Compliance Officer/Vice President Product Engineering Shall:**

    1.    Establish a Nonroad Compliance Hotline that will allow employees to submit compliance information;

    2.    Coordinate the preparation of the Certified Quarterly Reports with the President; and

    3.    Be responsible for implementing the Low Permeation Fuel Line Mitigation Project set forth in Paragraph 3 of Appendix G of the Consent Decree.

C. **Compliance Manager Shall:**

    1.    Be responsible for compliance with the testing, certification and related record-keeping requirements set forth in the Consent Decree and in the Compliance Plan (Appendix E) of the Consent Decree.

D. **Incoming Quality Manager Shall:**

    1.    Verify labels and paperwork and document compliance during incoming inspection;

    2.    Provide documentation for the NRCG to review at quarterly meetings;

    3.    Assist with the record creation, record maintenance and record-keeping requirements; and

    4.    Create a "Certification List" and an Import Compliance Evaluation Sheet.

E. **Project Manager Shall:**

    1.    Be responsible for ensuring that all contracts for the purchase or importation of handheld engines manufactured outside the United States

for sale or distribution into the United States specify that the engines are certified, properly labeled, and meet applicable emissions standards; and

2.    Obtain the identity of the "Supplier's Compliance Officer."

**F.  Accounting/Transportation Manager Shall:**

1.    Verify costs of Low Permeation Mitigation Project requirements; and

2.    Assist with record-keeping.

6

**Appendix F**

**Jenn Feng Industrial Co. Ltd. and McCulloch Corporation Test Plan**

**Emissions Testing of Handheld Equipment Engines**

Jenn Feng Industrial Co. Ltd. ("Jenn Feng") and McCulloch Corporation ("McCulloch") shall complete emissions tests on each engine family identified in Paragraph 12 of the Consent Decree in accordance with this 40 C.F.R. Part 90, subparts D and E within thirty (30) days of the Effective Date of the Consent Decree.

Jenn Feng and McCulloch shall provide Transportation Research Center Inc. ("TRC Inc.") with at least ten (10) appropriately representative engines from each engine family identified in Paragraph 12 of the Consent Decree. The engine models and specifications for these engine families are tabulated in Table 1, below.

**Table 1.** Engine Models and Specifications for Test Engine Families.

| Engine Family | Class | Use Life (hr) | Model | Disp (cc) | Rated Pwr. (kW) | Rated Spd (rpm) | Rated Torque (N.m) | Torque Spd (rpm) | Equipment |
|---|---|---|---|---|---|---|---|---|---|
| 5MHXS.0254AA | IV | 50 | BL25 | 25.4 | 0.746 | 9000 | 0.88 | 6000 | Trimmer /Blower |
| 5MHXS.0294AB | IV | 50 | BL30 | 29.5 | 0.82 | 9000 | 1.2 | 6500 | Trimmer /Blower |
| 5MHXS.0424AA | IV | 50 | MS42 | 42.2 | 1.7 | 9500 | 1.88 | 7500 | Chainsaw |
| 5MHXS.0555AA | V | 50 | FS55 | 55 | 2.01 | 8500 | 2.95 | 7000 | Chainsaw |
| 6MHXS.0254AA | IV | 50 | BL25 | 25.4 | 0.746 | 9000 | 0.88 | 6000 | Trimmer /Blower |
| 6MHXS.0304AB | IV | 50 | BL30 | 29.5 | 0.8 | 9000 | 1.2 | 6500 | Trimmer /Blower |
| 6MHXS.0354AA | IV | 50 | CS 35 | 35 | 1.1 | 9000 | 1.2 | 8500 | Chainsaw |
| 6MHXS.0404AA | IV | 125 | MS40 | 40 | 1.5 | 9500 | 1.6 | 7500 | Chainsaw |
| 6MHXS.0424AA | IV | 50 | MS42 | 42.2 | 1.7 | 9000 | 1.88 | 7500 | Chainsaw |
| 6MHXS.0555AA | V | 50 | FS55 | 55 | 2.01 | 8500 | 2.95 | 7000 | Chainsaw |

For each of these engine families, Jenn Feng and McCulloch shall ensure that TRC Inc. shall select three engines for emissions testing in accord with this Test Plan. Out of the three test engines, Engine #3 shall be selected to carry out the durability testing according to the engine certified durability hours. If, however, engine # 3 is not capable of completing the durability testing, an appropriately representative engine determined by TRC to be capable of completing the durability testing shall be selected to carry out the durability testing according to the engine certified durability hours.

With regard to engine families 5MHXS.0254AA and 6MHXS.0254AA, two (2) appropriately representative engines from engine family 6MHXS.0254AA and one (1)

1

appropriately representative engine from engine family 5MHXS.0254AA shall be selected for emissions testing from a pool of at least three engines and tested in accord with this Test Plan. The remaining engines shall be kept at the laboratory to replace any engines that do not perform properly during testing.

**TEST MATRIX AND TEST CYCLE**

Table 2, below, shows the text matrix for the testing program. The "Low Hour" tests for Engine # 1 and Engine #2 shall represent emissions measurements shortly after an engine completes the break-in service accumulation. A break-in period of 12 hours shall be used. The "Full Cert" tests for Engine #3 represent a complete certification test that shall consist of a "Low Hour" test, "Half Life" test, and "Full Life" test. The Half Life shall be determined based on the remaining useful life after accounting for the break-in time of 12 hours. For example, for an engine with a 50-hour useful life, the half life shall be 31 hours (e.g. 12 hrs + (50 hrs – 12 hrs)/2 = 31 hrs). The full life shall be the useful life hours (e.g., either 50 hours or 125 hours for these engine families) referenced within Jenn Feng and/or McCulloch's engine family certification.

Pursuant to 40 C.F.R. Part 90, the test cycle for these test engines is 2-mode test cycle specified in 40 C.F.R. 90.410 and described in Table 2 Appendix A Subpart E of 40 C.F.R. Part 90 ("EPA 2-mode cycle"), with Mode 1 representing the engine with full load condition at rated speed, and Mode 2 representing the engine with no load condition and idling speed. The emissions data for these modes shall be weighted according to the 40 C.F.R. Part 90 weighting factors of 0.85 for Mode 1 and 0.15 for Mode 2. For all engine families, each test shall consist of only one emissions measurement unless there is cause to develop additional emissions testing information. No power generated during the idle mode shall be included in the calculation of emission results per 40 C.F.R. 90.410(d).

Break-in or service hour accumulation shall be carried out using the EPA 2-mode cycle and the same weighting factors as described earlier with a 3, 6 and 20 minute cycles for chainsaws, trimmers, and blowers, respectively, repeating over the desired number of break-in or service hours accumulated. The break-in hour accumulation shall be carried out on aging stands. The break-in cycles for chainsaws, trimmers and blowers were provided by Jenn Feng to represent the real-world duty cycle for these applications. Using the 12-hours break-in period for the 3-minute cycle as an example, the test engine shall run on full load condition at rated speed for 2.55 minutes or 153 seconds (i.e., 85% of 3 minutes) and then at a no load condition at idling speed for 0.45 minutes or 27 seconds (i.e., 15% of 3 minutes); this 3-minute cycle shall be repeated until it reaches the stated 12-hours of break-in period (i.e., 240 cycles).

2

**Table 2.** Test Matrix for the Testing Program.

| Engine Family | Engine #1 | Engine #2 | Engine #3 |
|---|---|---|---|
| MY2005 and MY2006 Engine Family Testing | | | |
| 5MHXS.0254AA | Low Hour | NA | NA |
| 5MHXS.0294AB | Low Hour | Low Hour | Full Cert. |
| 5MHXS.0424AA | Low Hour | Low Hour | Full Cert. |
| 5MHXS.0555AA | Low Hour | Low Hour | Full Cert. |
| 6MHXS.0254AA | NA | Low Hour | Full Cert. |
| 6MHXS.0304AA | Low Hour | Low Hour | Full Cert. |
| 6MHXS.0354AA | Low Hour | Low Hour | Full Cert. |
| 6MHXS.0404AA | Low Hour | Low Hour | Full Cert. |
| 6MHXS.0424AA | Low Hour | Low Hour | Full Cert. |
| 6MHXS.0555AA | Low Hour | Low Hour | Full Cert. |

## GENERAL TEST PROCEDURE

Jenn Feng and McCulloch shall ensure that the testing program is carried out by TRC Inc. in compliance with the emissions testing requirements of 40 C.F.R. Part 90, subparts D and E.  Jenn Feng and McCulloch shall ensure that the following steps are carried out by the laboratory or laboratories that conduct the testing program:

- All emissions testing shall be conducted in accordance with the applicable emissions test procedures in 40 C.F.R. Part 90, subparts D and E.
- Receive and prepare each engine.
- Install each engine in an emissions test cell.
- Make all applicable connections to fuel, air inlet, exhaust and cooling water.
- Prepare test fuel according to the specified fuel/oil ratio with certification test fuel and manufacturer provided or specified lubricating oil.  A sample of the pre-mixed test fuel shall be stored for fuel analysis if needed.
- Conduct a break-in service accumulation of 12 hours of running time prior to emissions test.  The engine shall be serviced during the break-in period per the manufacturer's instructions.
- Verify actual maximum power generated by the engine as per the engine specification prior to beginning the emissions test.
- Perform all necessary calibrations and checks to equipment and instrument, including dynamometer, CVS, analyzers etc., pursuant to 40 C.F.R. Part 90, subparts D and E.
- Verify that the engine has stabilized.  During the break-in period and a 20-minute warm up period, engine horsepower modal (second by second) data shall be recorded to illustrate and confirm engine stability prior to making emissions measurement.  Emissions measurements shall still be made even if the engine is unstabilized.  However, test data shall be reviewed and discussed with the EPA if the data is not considered representative or accurate of engine emissions.

3

- Conduct one (1) low hour EPA 2-mode cycle (C-Cycle using Phase II mode weighting) and measure gaseous emissions of HC, CO, NOx, and $CO_2$ using full-flow dilute (CVS) sampling.
- Process data and determine test results.
- Print test results, and operation and calibration data for review.
- For the Engine #3 test or the engines selected for durability testing, perform half useful life service accumulation as per the specified engine durability life using EPA 2-mode C-cycle.
- After verifying that the engine has stabilized, conduct one half life EPA 2-mode C-cycle and measure gaseous emissions of HC, CO, NOx, and $CO_2$ using full-flow dilute (CVS) sampling.
- Process data and determine test results.
- Print test results and operation and calibration data for review.
- Perform another half useful life service accumulation as per the specified engine durability life using EPA 2-mode C-cycle.
- After verifying that the engine has stabilized, conduct one full life EPA 2-mode C-cycle and measure gaseous emissions of HC, CO, NOx, and $CO_2$ using full-flow dilute (CVS) sampling.
- Process data, determine test results utilizing EPA 2-mode C-cycle Phase II weighting factors, and calculate deterioration factors.
- Print test results, and environment, operation and calibration data for review.
- Prepare summary test results for reporting after passing quality audit and review.
- Discuss summary test results and address comments where applicable.
- Remove engine from test cell and crate for return shipment.

4

**Appendix G**

**Mitigation Projects**

**1. LED Streetlights: $2.75 Million**

Jenn Feng Industrial Co. Ltd. ("Jenn Feng") and McCulloch Corporation ("McCulloch") shall spend no less than $2.75 million in accord with this Appendix G and the Consent Decree to provide at no cost light-emitting diode ("LED") streetlights, sport lights or parking lot lights to selected cities in the United States. These LED lights shall be used to replace traditional sodium lights and will reduce VOC and other criteria pollutants, greenhouse gas emissions, and energy consumption.

Within ninety (90) days of the Effective Date of the Consent Decree, Jenn Feng and McCulloch shall submit a list of between three (3) and eight (8) proposed cities to EPA for review and approval, along with a letter from each city expressing a commitment to participate in the project and an explanation of the rationale for selecting these cities. Jenn Feng and McCulloch shall consider the following factors in selecting proposed cities:

- cities that can leverage the use of funds from other sources.
- cities in those areas that are most severely affected by ozone.
- cities in states or regions of the country where substantial numbers of the Subject Chainsaws (as defined in Paragraph 3 of the Consent Decree) were sold.
- cities that are interested in the project and able to work within the deadlines set forth in the Consent Decree.

Within one hundred eighty (180) days of the Effective Date of the Consent Decree, Jenn Feng and McCulloch shall submit a separate project plan for each proposed city to EPA for review and approval. Each project plan shall be prepared by a lighting engineer and shall, at a minimum, include a lighting plan consistent with the city's requirements, a location map, a budget for the project and an implementation schedule. Upon approval by EPA, Jenn Feng and McCulloch shall implement these projects in compliance with the terms and schedule in the approved plans, this Appendix G and the Consent Decree.

Jenn Feng and McCulloch shall install LED lights in three (3) to five (5) cities, as approved by EPA, in accord with the Consent Decree and this Appendix G, by no later than June 1, 2010.

**2. Purchase and Surrender of NOx Allowances: $1.25 Million**

Jenn Feng and McCulloch shall spend no less than $1.25 million to purchase and then surrender to EPA Ozone Season NOx Allowances ("NOx Allowances"), or transfer such NOx Allowances to a non-profit third party selected by Jenn Feng and McCulloch for surrender in accord with this Appendix G and the Consent Decree. For purposes of this Consent Decree, the "surrender of allowances" means permanently surrendering NOx Allowances so that such allowances can never be used to meet any compliance requirement of any person under the Clean

1

Air Act or any other environmental law. Jenn Feng and McCulloch shall purchase the NOx Allowances at the prevailing market price.

If any NOx Allowances are transferred directly to a non-profit third party, Jenn Feng and McCulloch shall include a description of such transfer in the next report submitted to Plaintiffs pursuant to Section V (Reporting) of this Consent Decree. Such report shall: (a) provide the identity of the non-profit third-party recipient(s) of the NOx Allowances and a listing of the serial numbers of the transferred NOx Allowances; and (b) include a certification by the third-party recipient(s) stating that the recipient(s) shall not sell, trade, or otherwise exchange any of the NOx Allowances and shall not use any of the Allowances to meet any obligation imposed by any environmental law.

No later than the third periodic report due pursuant to Section V (Reporting) of this Consent Decree after the transfer of any NOx Allowances, Jenn Feng and McCulloch shall include a statement that the third-party recipient(s) tendered the NOx Allowances for permanent surrender to EPA.

Jenn Feng and McCulloch shall not have complied with the NOx Allowance surrender requirements of this Appendix G and the Consent Decree unless and until all third-party recipient(s) have actually surrendered the transferred NOx Allowances to EPA.

For all NOx Allowances surrendered to EPA, Jenn Feng and McCulloch or the non-profit third-party recipient(s) (as the case may be) shall first submit a NOx Allowance transfer request form to EPA directing the transfer of such NOx Allowances to the EPA's Enforcement Surrender Account or to any other account that EPA may direct in writing. As part of submitting these transfer requests, Jenn Feng and McCulloch or the third-party recipient(s) shall irrevocably authorize the transfer of these NOx Allowances and identify -- by name of account and any applicable serial or other identification numbers or station names -- the source and location of the NOx Allowances being surrendered.

Jenn Feng and McCulloch shall purchase and then surrender the NOx Allowances, or transfer such NOx Allowances to a non-profit third party on or before December 31, 2008.

**3.  1 Million Low-Permeable Fuel Lines:**

MTD Products Inc and MTD Southwest Inc (collectively "MTD") shall install low-permeable fuel lines that prevent or reduce VOC permeation emissions in no less than one (1) million small, spark-ignited engines used for handheld lawn and garden applications in accord with this Appendix G and the Consent Decree. Permeation emissions occur due to the permeation of the fuel through the lines, which are ordinarily manufactured from plastic or polycarbonate materials. Once the fuel permeates through the fuel lines, it will rapidly evaporate and contribute to evaporative VOC emissions, which are a precursor for ozone formation. The low-permeable fuel lines are modeled and similar to those used in automotive applications and are generally constructed from multi-layered plastic tubing made of fluoropolymers. The low-permeable fuel lines shall meet a permeation standard of 15 $g/m_2/day$ at 23°C using E10 test fuel.

2

MTD anticipates that this will reduce VOC emissions from permeation by approximately 90-100%.

Within sixty (60) days of the Effective Date of the Consent Decree, MTD shall submit a project plan to EPA for review and approval that identifies engine families, models and projected production volumes for each engine family that shall be equipped with the low-permeable fuel lines. The low-permeable fuel lines must be installed in 2008 and 2009 MY engines families. MTD shall not request or claim emission credits from EPA or the California Air Resources Board ("CARB") for engines subject to this Consent Decree.

In the event that Jenn Feng and/or McCulloch fail to spend the amounts required pursuant to Paragraph 1 or 2 of this Appendix G, MTD shall, as soon as practicable, but in no event later than the end of Model Year 2011, spend the difference between the amounts required and the amounts actually spent by Jenn Feng and/or McCulloch to equip additional small, spark-ignited engines with low-permeable fuel lines in accord with this Appendix G and the Consent Decree. Within thirty (30) days after MTD receives notice that Jenn Feng and/or McCulloch have failed to spend the amounts required pursuant to Paragraph 1 or 2 of this Appendix G, MTD shall submit a proposed plan, schedule and justification for the schedule to EPA to equip the additional small, spark-ignited engines with low permeable fuel lines.

### 4. Calculation of Additional Project Dollars

If the average test results for any engine family tested in accordance with Paragraph 12 and Appendix F of the Consent Decree exceed the applicable emissions standards, the Defendants shall use the formula set forth below to calculate the Additional Project Dollars to be spent on the projects set forth in this Appendix. The Defendants shall spend the Additional Project Dollars on each of the projects on a pro rata basis.

Additional Project Dollars = Excess Emissions x $ 2,000.

Where

$$\text{Excess Emissions (tons)} = \frac{(([E_{test} * DF] - [Std])\, g/bhp\text{-}hr \ \text{x} \ LF \ \text{x} \ P\, bhp \ \text{x} \ UL\, hours \ \text{x} \ N)}{908{,}000\, g/ton}$$

Where

$E_{test}$ is the mean of all "zero-hour" tests performed on an engine model or engine family in g/bhp-hr

DF is the deterioration factor submitted with the cert application

Std is the emission standard in g/bhp-hr

LF is the Load Factor from the EPA's NONROAD model

P is the maximum engine power ("rated power") in bhp, from the cert application

UL is the useful life in hours chosen for the engine, from the cert application (question 10 on the cert application)

N is the number of engines in that model or engine family that were introduced into commerce

3